## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DONNA M. MOSLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NUMBER: |
| v. | ) | |
| | ) | 1:20-cv-00517 |
| AM/NS CALVERT, LLC, | ) | |
| | ) | PLAINTIFF DEMANDS A |
| Defendant. | ) | TRIAL BY STRUCK JURY |

## COMPLAINT

### JURISDICTION AND VENUE

1.    This is a suit to obtain relief for disability discrimination, age discrimination, interference with rights, and retaliation. The Plaintiff alleges the Defendant violated the Americans with Disabilities Act, as amended ("ADA") and the Age Discrimination in Employment Act ("ADEA").

2.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, 28 U.S.C. §§2201 and 2202.

3.    Venue is proper under 28 U.S.C. § 1391, as the Defendant employed the Plaintiff in Mobile County, Alabama.

PARTIES

4.   The Plaintiff, Donna M. Mosley, was more than 19 years old at the time of the events in question and is a resident of the State of Alabama.

5.   Defendant AM/NS Calvert, LLC ("AM/NS") is a foreign limited liability company formed in the State of Delaware and doing business in Mobile County, Alabama.

6.   AM/NS is a 50/50 joint venture between ArcelorMittal and Nippon Steel Corp. (NSC).

7.   AM/NS is a steel processing plant located in Calvert, Alabama, about 35 miles north of Mobile.

8.   The plant has served North American markets since 2010 with the capacity to produce 5.3 million tons of flat rolled carbon steel products annually.

9.   The facility produces flat rolled carbon steel products to be used in the automotive, construction, pipe and tube, service center, and appliance/ HVAC industries.

10.  AM/NS employs approximately 1,604 employees.

11.  In 2020, AM/NS decided to invest more than $500 million at its Mobile facility due to the USMCA trade agreement which calls for the auto industry to use more North American-produced steel.

12.     For purposes of the ADA, AM/NS was Ms. Mosley's employer.

13.     For purposes of the ADEA, AM/NS was Ms. Mosley's employer.

## ADMINISTRATIVE REMEDIES

14.     Ms. Mosley's last day of employment with AM/NS was June 25, 2018.

15.     On or about October 23, 2018, Ms. Mosley filed a Charge of Discrimination

against AM/NS alleging disability discrimination, age discrimination, and

retaliation. A copy of Ms. Mosley's Charge of Discrimination is attached as

Exhibit 1.

16.     On November 1, 2018, the EEOC sent a Notice of Charge to AM/NS.

17.     The EEOC's Notice of Charge to AM/NS advised it to preserve all payroll

and personnel records relevant to the charge.

18.     The EEOC issued and mailed to Ms. Mosley a Dismissal and Notice of

Rights dated August 7, 2020. A copy is attached as Exhibit 2.

19.     Ms. Mosley initiated this action within 90 days of receipt of the Dismissal

and Notice of Rights.

20.     All administrative prerequisites to bringing this action have been met.

21.     Ms. Mosley exhausted her administrative remedies.

## FACTUAL ALLEGATIONS

22.     Ms. Mosley was born in 1957.

23. Ms. Mosley began working for ThyssenKrupp Steel USA, LLC at its facility in Calvert, Alabama on or about September 28, 2008 through a placement company, Long's Human Resources.

24. In 2009, ThyssenKrupp Steel USA, LLC hired Ms. Mosley to work directly for it as a Benefits/Payroll Specialist.

25. AM/NS later acquired the Calvert facility and its employees.

26. Since acquiring the Calvert facility, AM/NS has invested more than $200,000,000 in strategic projects in the facility.

27. In approximately 2011, Ms. Mosley was given the task of creating Nimbus HR Process Maps and associated documents.

28. In 2013, AM/NS transitioned Ms. Mosley into the position of Lead Specialist Human Resources in Rep II HRIS (Human Resources Information Systems).

29. Ms. Mosley was a Lead Specialist Human Resources in Rep II HRIS through the end of her employment.

30. Ms. Mosley retained the NIMBUS responsibilities she had held, but SAP ("Systems, Applications, and Products") responsibilities were added.

31. When AM/NS moved Ms. Mosley into the Lead Specialist Human Resources position, the Director of Human Resources (Joel Stadtlander) and

Team Manager L&D/Recruiting (Jennifer Miniard) met with Ms. Mosley about their decision to move her into that position, and she agreed to continue to function in her HR Nimbus Author role in addition to HRIS (which did not include maintenance of Org Manager).

32.  Ms. Mosley's duties as a Lead Specialist Human Resources included, but were not limited to, heavy data entry into SAP including, but not limited to, processing of employee records relating to new hires, terminations, organizational reassignments, job changes, salary changes, and address changes.

33.  Ms. Mosley responded to requests from internal sources for various reports and information.

34.  Ms. Mosley created and maintained positions and organizational charts.

35.  Ms. Mosley created and maintained the HR Nimbus process and associated documents.

36.  Ms. Mosley submitted SAP OM changes into Service Now via SharePoint to ensure data integrity for "Helpdesk" and "Active Directory."

37.  From 2013 to 2016, Joel Stadtlander, Director of Human Resources, supervised Ms. Mosley.

38.  In 2016, Brooke Atchison Dolbare, Team Manager Compensation, Benefits

and HRIS, became Ms. Mosley's supervisor.

39. Ms. Dolbare reported to Mr. Stadtlander.

40. Ms. Dolbare is more than 20 years younger than Ms. Mosley.

41. Ms. Mosley suffers from arthritis in her left hand.

42. Starting in July 2017, Ms. Mosely began wearing a splint on her hand due to basal thumb osteoarthritis.

43. In August 2018, Ms. Mosely received a steroid injection in her left thumb.

44. By December 2017, the arthritis in Ms. Mosley's left hand was causing her great pain and limiting her ability to fully use her hand.

45. On or about December 7, 2017, Ms. Mosley requested medical leave to begin December 29, 2017 for surgery (trapeziectomy) on her left hand.

46. A trapeziectomy involves removing a small bone, one of eight which form the wrist, called the trapezium which is situated at the base of the thumb.

47. A trapeziectomy is used to treat arthritis to reduce pain, increase strength, ad overall function.

48. The recovery from a trapeziectomy is slow, taking most patients 4-6 months to regain full use of his or her hand.

49. Ms. Dolbare was not involved in the decision as to whether to grant medical leave to Ms. Mosley.

50.   Paula Lindsey handled the approval of the medical leave.

51.   AM/NS informed Ms. Dolbare that Ms. Mosley's medical leave had been approved.

52.   After Ms. Mosely requested and received approval for medical leave, Ms. Dolbare put unreasonable demands upon Ms. Mosley which would have been impossible for Ms. Mosley to complete due to the problems with her hand that were necessitating the surgery.

53.   For example, knowing that Ms. Mosley was limited in the use of her left hand, Ms. Dolbare assigned 250 exceptions for Ms. Mosley to manually input/type into the system.

54.   Two other employees, Paula Lindsey and Mary Kaitlin Sheffield, were available to assist with the exceptions, but Ms. Dolbare gave all the exceptions to Ms. Mosley who was on the eve of having hand surgery.

55.   Ms. Mosley returned from medical leave on or about February 21, 2018.

56.   Ms. Mosley returned to work with a splint on her left hand.

57.   Ms. Mosley returned to work with medically imposed restrictions that required her to wear her splint and included no lifting with her left hand, no climbing, no vibratory tools, and no repetitive heavy gripping.

58.   Ms. Mosley was still limited in the use of her left hand due to the splint, pain

from recovering from surgery, healing of her hand, and medically imposed restrictions.

59. Ms. Mosley's medically imposed restrictions required accommodation at work.

60. Ms. Mosley made AM/NS aware of her medical restrictions and requested accommodation.

61. Ms. Mosley informed AM/NS she would also need accommodation in the form of intermittent medical leave for follow-up medical treatments and occupational/physical therapy.

62. Ms. Dolbare expressed exasperation at Ms. Mosley's requests for accommodation.

63. Tanny McMillan, another employee, received similar pushback when she needed medical leave for breast cancer treatments.

64. After Ms. Mosley returned in 2017, Ms. Dolbare expressed her desire to remove Ms. Mosley from her position by commenting to her "[t]here needs to be an Analyst in your position."

65. When Ms. Mosely returned, she found that Ms. Dolbare had left all the new hire data accumulated during Ms. Mosely's absence for Ms. Mosely to input.

66. The data which Ms. Dolbare had directed to be left for weeks, if not months,

for Ms. Mosely to input included the new hire dates of January 8, January 29, February 12, and February 19.

67. Ms. Dolbare left the new hire data unprocessed to put Ms. Mosely in a difficult position upon her return from surgery.

68. Ms. Dolbare embarrassed and humiliated Ms. Mosley in front of her coworkers by making derogatory comments about her work.

69. Ms. Dolbare subjected Ms. Mosley to constant micro-management.

70. Ms. Dolbare began going through Ms. Mosley's work to find deficiencies in her performance.

71. Ms. Dolbare tried to turn other team members against Ms. Mosley by asking Mary Katelynn Sheffield, an employee in her 20s, to watch Ms. Mosley.

72. Ms. Sheffield was the youngest member of Ms. Mosley's team at work.

73. When Ms. Sheffield saw Ms. Mosley make one error, she exclaimed "Bam!"

74. In contrast, when Ms. Mosley found many errors made by Ms. Sheffield, she did not humiliate Ms. Sheffield.

75. Approximately a week after Ms. Mosley returned from leave and requested accommodation, on or about March 1, 2017, Ms. Dolbare issued to Ms. Mosley a performance evaluation that rated her as "somewhat meets expectations."

76. Ms. Mosley was still wearing a splint on her hand in March 2017.

77. The performance evaluation misrepresented several aspects of Ms. Mosley's job performance.

78. The performance evaluation referenced alleged deficiencies that were asserted to have occurred more than seven (7) months earlier but had not been brought to Ms. Mosley's attention.

79. This was the first performance evaluation Ms. Mosley received that had not been positive during her tenure with AM/NS.

80. The performance evaluation was the beginning of an effort by Ms. Dolbare to document Ms. Mosely out of the system.

81. Ms. Mosley objected to the accuracy of the performance evaluation and provided AM/NS with rebuttal information.

82. Despite being confronted with evidence that the performance evaluation was inaccurate, AM/NS Calvert did not change it.

83. The performance evaluation was purposely inaccurate.

84. Ms. Mosley complained she "felt threatened with my job" and that she was "being 'set-up to fail.'"

85. In response, AM/NS did not take any action to address Ms. Mosley's complaints.

86.   On or about April 13, 2018, while at work, Ms. Mosley began experiencing chest pain, right shoulder pain, and pain down her right arm.

87.   Ms. Mosley was taken from AM/NS to Springhill Memorial Hospital by ambulance.

88.   Ms. Mosley remained in the hospital overnight for cardiac enzyme monitoring.

89.   Ms. Mosley's doctors determined she required a cholecystectomy.

90.   Ms. Mosley informed AM/NS that she required another surgery and would need additional time off from work for the medical treatment.

91.   Just prior to Ms. Mosley leaving for her cholecystectomy, Ms. Dolbare assigned her numerous additional duties and tasks to Ms. Mosley that were like those that were being transferred to Mary Katelynn Sheffield.

92.   Ms. Dolbare increased Ms. Mosley's workload but did not increase anyone else's in the department.

93.   As a result, Ms. Mosely's assigned workload was substantially more than anyone else in the department under Ms. Dolbare's supervision.

94.   There was not a reason to assign those tasks to Ms. Mosley when Ms. Sheffield could perform them.

95.   Ms. Mosley still suffered pain and limitations when she used her left hand

because she had not fully recovered from the trapeziectomy she had in December 2017.

96.  The increased workload was an effort to make it appear Ms. Mosley was not completing assigned work since Ms. Dolbare knew Ms. Mosley would soon be leaving for surgery.

97.  After her surgery, Ms. Mosley returned to work on or about May 29, 2018.

98.  When Ms. Mosley returned to work, she requested from Ms. Dolbare the accommodation of having her workspace temporarily relocated closer to a restroom due to gastrointestinal emergencies related to the effect the loss of her ball bladder had on her IBS-D.

99.  Ms. Mosley had reported to AM/NS two years prior that she suffered from IBS-D.

100.  At the time of Ms. Mosley's request, there were open workstations in her work area that were located near the restroom.

101.  Ms. Dolbare refused Ms. Mosley's request for an accommodation.

102.  Ms. Mosley immediately complained to Team Member Relations representatives Jason Motes and Jeremy Doggette that Ms. Dolbare had denied her request for an accommodation.

103.  Having to explain the impact of the cholecystectomy on her IBS-D and the

need for the accommodation to Mr. Motes and Mr. Doggette after just having explained it to Ms. Dolbare was embarrassing and humbling for Ms. Mosley.

104. Ms. Mosley saw Ms. Dolbare nearby when Ms. Mosley complained to the Team Member Relations members.

105. Upon information and belief, Ms. Dolbare observed Ms. Mosley complaining to the Team Member Relations representatives.

106. Sometime after Ms. Mosley complained to the Team Member Relations representatives, Ms. Dolbare informed Ms. Mosley that she could relocate closer to the restroom.

107. Upon information and belief, Ms. Dolbare was reprimanded by Team Member Relations for refusing Ms. Mosley's request for an accommodation.

108. Ms. Dolbare was upset to be reprimanded because of Ms. Mosley's complaint.

109. Approximately two weeks later, on or about June 15, 2018, Ms. Mosley completed the employee portion of her mid-year review.

110. Ms. Mosley documented complaints about negative treatment and retaliation she was experiencing because of her medical needs and accommodation of time off from work for medical treatment.

111. On June 15, 2018, Ms. Mosley emailed Queen Robertson, a Team Member Relations representative, asking to speak with her about the complaints Ms. Mosley made in her portion of the mid-year review.

112. Ms. Mosley scheduled a meeting with Ms. Robertson for June 18, 2018.

113. On June 18, 2018, Ms. Mosley renewed her complaints of retaliation and discrimination orally to Ms. Robertson.

114. Team Member Relations and Ms. Robertson dismissed Ms. Mosley's complaints.

115. Ms. Mosley's complaints expressed in her mid-year review were not investigated by AM/NS.

116. Ms. Mosley's complaints expressed to Team Member Relations were not investigated by AM/NS.

117. Ms. Mosley concluded that Team Relations did not want to help her and that future complaints would be futile.

118. AM/NS trains its managers and supervisors that documentation is needed to terminate an employee.

119. After Ms. Mosley's complaints, Ms. Dolbare intensified her scrutiny of Ms. Mosley at work.

120. Ms. Dolbare was looking for reasons to criticize and discipline Ms. Mosley.

121.  Ms. Dolbare did not subject other employees to the heightened scrutiny she directed toward Ms. Mosley.

122.  Ms. Dolbare could not find any legitimate reason to discipline Ms. Mosley.

123.  Four days later, on or about June 22, 2018, Ms. Dolbare presented Ms. Mosley with a performance improvement plant ("PIP").

124.  Ms. Robertson was present when Ms. Dolbare presented the PIP to Ms. Mosley.

125.  Ms. Dolbare made the decision to place Ms. Mosley on the PIP.

126.  Despite Ms. Sheffield making numerous errors in her work, Ms. Dolbare did not document the deficiencies and errors, nor did she place her on a PIP.

127.  Ms. Dolbare did not document the numerous deficiencies and errors made by Shaye George, an employee who was in her 30s, nor did she place her on a PIP.

128.  Ms. Dolbare made numerous errors in SAP which Ms. Mosley corrected, including errors in compensation changes.

129.  Ms. Dolbare did not self-report her errors to her supervisor.

130.  The PIP misrepresented several aspects of Ms. Mosley's job performance.

131.  Prior to this date, Ms. Mosley observed AM/NS use PIPs to manage out older employees.

132.   AM/NS used a PIP to create documentation to justify terminating Steve
       Howser a few months earlier in March 2018.

133.   At the time of his termination, Mr. Howser was the second oldest person in
       her department.

134.   Ms. Mosley was the oldest person in the department.

135.   AM/NS terminated Tanny McMillan shortly after she revealed her breast
       cancer diagnoses and need for an accommodation of time away from work
       for treatment to the company.

136.   At the time AM/NS presented to PIP to her, Ms. Mosley was 61 years old.

137.   The PIP rendered Ms. Mosley ineligible for a raise or salary increase.

138.   The PIP precluded Ms. Mosley from changing jobs.

139.   The PIP precluded Ms. Mosley's upward mobility with AM/NS.

140.   Because the PIP was a tool used for managing employees toward
       termination, restricted Ms. Mosley from changing jobs, precluded
       promotion, and barred salary a raise/salary increase, it affected Ms. Mosley's
       employment status because she was denied the same terms and conditions of
       employment as other workers not on a PIP.

141.   This was the first time in Ms. Mosley's employment history with the
       Defendant or its predecessor that she had not received any compensation

increase.

142.   The PIP was to last 90 days.

143.   The PIP included many things which were not normally required of Ms.
       Mosley.

144.   The PIP did not include clear benchmarks or objective criteria for
       evaluation.

145.   In terms of productivity, the PIP directed to "[f]ind ways to be productive"
       and then demanded busy-work that would detract from productivity by
       requiring Mosley to make lists of tasks completed.

146.   The PIP contained unreasonable expectations that could not be met in the
       time provided.

147.   Despite the volume and nature of the work making errors numerous and
       frequent in the department, including errors made by Dolbare, Sheffield, and
       George, the PIP directed that Ms. Mosley was to have no errors in a BAR
       report, and no more than 1 error in the processing of SAP maintenance. This
       was an impossible requirement due to the nature of work.

148.   The PIP contained subjective criteria that could not be objectively assessed
       and would allow Dolbare to manipulate the outcome of the PIP. For
       example, while it directed Ms. Mosley to "[w]ork as a team player" it left

the decision as to whether Ms. Mosley was meeting that benchmark up to Dolbare.

149. The PIP was the equivalent of a directive to "do better" without any clear direction on what Ms. Mosley could do or what would satisfy the directive.

150. The PIP was setting Ms. Mosley up to fail.

151. The PIP was an effort to create a paper trail to fire Ms. Mosley.

152. The PIP was a tool to make working conditions so intolerable for Ms. Mosley that she would quit.

153. The PIP was a tool AM/NS was using to manage Ms. Mosley out of her job due to her age, health and related requests for accommodation, and/or complaints.

154. It was apparent to Ms. Mosley that Ms. Dolbare was committed to firing Ms. Mosley.

155. Ms. Mosley worried she would lose benefits, including retirement, and employability if she were fired.

156. The PIP created undue stress and hardship for Ms. Mosley relating to her recovery from her cholecystectomy.

157. Ms. Mosley had no choice but to resign her employment with AM/NS to avoid termination and injury to her health and wellbeing; she was

constructively discharged.

158.   The dismissive treatment she received from Team Member Relations

evidenced that future complaints would be futile and she had no where else

to go for help.

159.   On June 25, 2018, Ms. Mosley submitted a letter to Ms. Dolbare (Team

manager Compensation and Benefits), Mr. Stadtlander (Director Human

Resources), and Ms. Robertson (Team Member Relations Representative) in

which she wrote that she was submitting her "immediate, involuntary

resignation, under duress, due to the undue stress and hardship that the

Personal Improvement Plan (PIP) would place upon [her], physically, with

respect to [her] ongoing recovery from the effects of [her] recent

cholecystectomy."

160.   After receiving the letter, AM/NS made no effort to see if any

accommodation could be reached to permit Ms. Mosley to continue to work.

161.   Nobody from AM/NS reached out to Ms. Mosley to find out more

information concerning her involuntary resignation.

162.   AM/NS did nothing in response to Ms. Mosley's letter informing the

company that its actions had constructively discharged her.

163.   AM/NS reassigned Ms. Mosley's duties to Shaye George, an employee who

had not exhibited any physical or mental impairments, who had not

complained of any discrimination, and who was in her 30s.

COUNT I
AMERICANS WITH DISABILITIES ACT, AS AMENDED
(Constructive Discharge)

164. For purposes of background and context, Ms. Mosley adopts and

incorporates the foregoing facts by reference.

165. Ms. Mosley was qualified to hold her job with AM/NS.

166. Ms. Mosley suffered from several physical impairments that affected one or

more major life activities.

167. Ms. Mosley suffers from arthritis which substantially impaired her ability to

use her left hand.

168. Ms. Mosley suffers from IBS-D (Irritable Bowel Syndrome with Diarrhea)

which affects her digestion and limits her quality of life.

169. Ms. Mosley had her gall bladder removed which affected and impaired her

digestion.

170. Because of Ms. Mosley's impairments, she requested accommodations from

the Defendant which included modified use of her left hand and time off

from work for medical treatment.

171. Ms. Mosley was a qualified individual with a disability as defined by the

ADA because she had a record of impairments, actual impairments which limited her in one or more major life activities, and because AM/NS regarded Ms. Mosley as disabled.

172. AM/NS subjected Ms. Mosley to heightened scrutiny, inaccurate reporting of her performance, and a Performance Improvement Plan because she is a qualified individual with a disability.

173. AM/NS constructively discharged Ms. Mosley because of her disability because it put her in a position of facing termination and making her health worse if she remained and was forced to work under the PIP.

174. AM/NS made no effort to engage in the interactive process required by the ADA when Ms. Mosley raised the issue on June 25 that she was resigning "under duress, due to the undue stress and hardship that the Personal Improvement Plan (PIP) would place upon [her], physically, with respect to [her] ongoing recovery from the effects of [her] recent cholecystectomy."

175. AM/NS made no effort to see if could accommodate Ms. Mosley through a modification of the PIP or other means to permit Ms. Mosley to remain employed.

176. AM/NS's conduct causing and embracing Ms. Mosley's constructive discharge violated the Americans with Disabilities Act, as amended.

177.   AM/NS's discriminatory conduct injured Ms. Mosley.

WHEREFORE, PREMISES CONSIDERED, Ms. Mosley seeks entry of a

judgment against the Defendant awarding:

    a.    Compensatory damages to be determined by the trier of fact;

    b.    Punitive damages to be determined by the trier of fact;

    c.    Injunctive relief, including, but not limited to, backpay, reinstatement,
        and/or reasonable front pay;

    d.    That relief which is fair, just and equitable under the facts of the case;

    e.    Pre-judgment and post-judgment interest;

    f.    An offset for increased tax liability resulting from a lump sum
        payment of wages owed to the plaintiff; and

    g.    Costs, including a reasonable attorney's fee.

### COUNT II
### RETALIATION - ADA

178.   For purposes of background and context, Ms. Mosley adopts and

incorporates the foregoing facts by reference.

179.   Ms. Mosely engaged in activity protected by the ADA when she sought

accommodations for her physical impairments including, but not limited to,

honoring the work restrictions for her left hand, time off from work for

surgeries and medical treatments, and moving her workstation closer to the

restroom.

180.  Ms. Mosely engaged in activity protected by the ADA when she complained about Ms. Dolbare denying her request for accommodation to move her workstation closer to the restroom.

181.  AM/NS subjected Ms. Mosley to actions that would dissuade someone from seeking accommodation and complaining about a denial of accommodation when it subjected her to heightened scrutiny, efforts to set her up to fail, inaccurate assessments of her performance, and a Performance Improvement Plan.

182.  AM/NS's retaliatory conduct served to constructively discharge Ms. Mosley.

183.  AM/NS's retaliatory conduct injured Ms. Mosley.

WHEREFORE, PREMISES CONSIDERED, Ms. Mosley seeks entry of a judgment against the Defendant awarding:

a.  Compensatory damages to be determined by the trier of fact;

b.  Punitive damages to be determined by the trier of fact;

c.  Injunctive relief, including, but not limited to, backpay, reinstatement, and/or reasonable front pay;

d.  That relief which is fair, just and equitable under the facts of the case;

e.  Pre-judgment and post-judgment interest;

f.  An offset for increased tax liability resulting from a lump sum

payment of wages owed to the plaintiff; and

g.  Costs, including a reasonable attorney's fee.

## COUNT III
## INTERFERENCE - AMERICANS WITH DISBILITIES ACT

184.  For purposes of background and context, Ms. Mosley adopts and

incorporates the foregoing facts by reference.

185.  Starting in December 2017 and continuing through her constructive

discharge in June 2018, Ms. Mosley endured a pattern of hostile and adverse

treatment rooted in AM/NS's antagonism toward Ms. Mosley's protected

activities under the ADA.

186.  Ms. Mosley engaged in activity statutorily protected by the ADA when she

requested accommodations and complained about denial of an

accommodation.

187.  By pursuing accommodation, Ms. Mosley was engaged in the exercise or

enjoyment of ADA protected rights.

188.  AM/NS coerced, threatened, intimidated, or interfered on account of Ms.

Mosley's protected activity when it subjected her to heightened scrutiny, made false representations about her performance, put her on a PIP, and refused to explore an accommodation when she made them aware that the PIP was constructively discharging her due to its effects on her gastrointestinal health.

189.   AM/NS has interfered with the efforts of other employees, including but not limited to Tanny McMillan and Robert Lancaster, to engage in the exercise or enjoyment of ADA protected rights

190.   The temporal proximity between Ms. Mosley's protected activity and AM/NS subjecting her to heightened scrutiny, making false representations about her performance, and putting her on a PIP was close.

191.   AM/NS's actions were motivated by an intent to discriminate.

192.   AM/NS's actions violated the ADA's interference clause.

WHEREFORE, PREMISES CONSIDERED, Ms. Mosley seeks entry of a judgment against the Defendant awarding:

a.   Compensatory damages to be determined by the trier of fact;

b.   Punitive damages to be determined by the trier of fact;

c.   Injunctive relief, including, but not limited to, backpay, reinstatement,

and/or reasonable front pay;

d.    That relief which is fair, just and equitable under the facts of the case;

e.    Pre-judgment and post-judgment interest;

f.    An offset for increased tax liability resulting from a lump sum

payment of wages owed to the plaintiff; and

g.    Costs, including a reasonable attorney's fee.

## COUNT VI
## AGE DISCRIMINATION IN EMPLOYMENT ACT
### (Constructive Discharge)

193.    For purposes of background and context, Ms. Mosley adopts and

incorporates the foregoing facts by reference.

194.    Ms. Mosely was over the age of 40 during the events relevant to this lawsuit.

195.    Ms. Mosley was the oldest person working on her team for AM/NS in 2017

and 2018.

196.    AM/NS criticized Ms. Mosley more harshly than younger persons on her

team for making similar and/or identical mistakes.

197.    AM/NS provided training on its new system   relating not the

implementation of the applicant tracking and on boarding modules to Mary

Katelynn Sheffield, the youngest member of the team who was more than 20

years Ms. Mosley's junior, which it did not provide to Ms. Mosley.

198.   The disparity in training provided signaled to Ms. Mosely that AM/NS was investing in Ms. Sheffield's future with the company but not Ms. Mosely's.

199.   The disparity in training appeared to be an effort to set Ms. Mosley up to fail and/or not be as successful as she could be with the new system.

200.   The Defendant subjected Ms. Mosley to heightened scrutiny and inaccurate documentation relating to her performance, including a PIP, because of her age.

201.   Substantially younger employees made numerous errors and exhibited performance that was less satisfactory than Ms. Mosley, but the younger employees' deficiencies were not documented, nor were the younger employees put on a PIP.

202.   The Defendant used PIPs as tools terminate older employees.

203.   Defendant's efforts to fire Ms. Mosley culminated in her constructive discharge on June 25, 2018.

204.   Defendant replaced Ms. Mosley with someone substantially younger, Ms. George, by assigning her Ms. Mosley's job duties.

205.   AM/NS brought Ms. George into Ms. Mosley's department in April 2018,

two months prior to Ms. Mosely's constructive discharge.

206.   The timing of Ms. George's arrival to Ms. Mosely's department combined with heightened scrutiny and criticism of Ms. Mosely at that time suggested that Ms. George was brought into the department to replace Ms. Mosely.

207.   Defendant discriminated against Ms. Mosley because of her age.

208.   Defendant's discriminatory conduct injured Ms. Mosley

WHEREFORE, PREMISES CONSIDERED, Ms. Mosley seeks entry of a judgment against the Defendant awarding:

a.   Backpay;

b.   Liquidated damages;

c.   Injunctive relief, including, but not limited to, backpay, reinstatement, and/or reasonable front pay;

d.   That relief which is fair, just and equitable under the facts of the case;

e.   Pre-judgment and post-judgment interest;

f.   An offset for increased tax liability resulting from a lump sum payment of wages owed to the plaintiff; and

g.   Costs, including a reasonable attorney's fee.

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY**

_____
*Mosley v. AM/NS Calvert*
**Complaint**
**Page 28 of 29**

Respectfully submitted,

/s/ Heather Newsom Leonard
Heather Newsom Leonard
ASB-1152-O61H
ATTORNEY FOR PLAINTIFF
HEATHER LEONARD, P.C.
P.O. Box 43768
Birmingham, AL 35243
(205) 977-5421 - voice
(205) 278-1400 - facsimile
Heather@HeatherLeonardPC.com

**PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL:**

AM/NS Calvert, LLC
c/o C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

_____
*Mosley v. AM/NS Calvert*
**Complaint**
**Page 29 of 29**