IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DONNA M. MOSLEY, | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION: 1:20-00517-KD-M |
| | ) | |
| AM/NS CALVERT, LLC, | ) | |
| **Defendant.** | ) | |

## ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs. 29-32, 39), Plaintiff's Response (Docs. 37, 38), and Defendant's Reply (Doc. 40); and Defendant's Motion to Strike (Doc. 41) and Plaintiff's Response (Doc. 42).

## I.  __Findings of Fact__[1]

On September 28, 2008, Plaintiff Donna M. Mosley (Mosley), who was born in 1957, began her employment with non-party ThyssenKrupp Steel USA, LLC at its facility in Calvert, Alabama, through Long's Human Resources.  (Doc. 1 at 4; Doc. 31- 1 (Dep. Mosley at 39, 48-49 and EEOC Charge attached thereto)).  In June 2009, Mosley became a Benefits/Payroll Specialist, with a focus on benefits for new hires (versus payroll).  (Doc. 31-1 (Dep. Mosley at 51-52, 58).  In 2011, Mosley was assigned with the task of creating Nimbus[2] HR Process Maps.  (Doc. 1 at 4).

---

1 The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

2 Nimbus is the software that the AM/NS business management system group uses, which houses the company's processes and policies in an electronic format to be able to show customers quality critical and business critical policies and processes as needed, and for employees to be able to read and access such as needed. (Doc. 31-8 (Dep. Stadtlander at 86)). It is a document repository system where policies and processes warehouse and when changed, updated, and multiple departments had "authors" in the system. (Doc. 31-1 (Dep. Mosley at 60, 74-75, 234-235); Doc. 31-6 (Aff. Stadtlander at ¶10); Doc. 31-8 (Dep. Stadtlander at 86-89)).

In 2013, Mosley became a Lead Specialist Human Resources in Rep II HRIS (Human Resources Information Systems) at ThyssenKrupp. (Doc. 31-1 (Dep. Mosley at 67, 77-80, 83, 109-110); Doc. 31-6 (Aff. Stadtlander at ¶¶10, 14); Doc. 31-7 (Dep. Dolbare at 21, 23)). When she was given the position, Mosley met with then Area Manager for Human Resources Joel Stadtlander (Stadtlander)[3] and then Team Manager L&D Recruiting Jennifer Miniard (Miniard) about the decision to move her into the role, and she agreed to continue to function in her HR Nimbus author[4] role as well as HRIS. (Doc. 1 at 4; Doc. 31-1 (Dep. Mosley at 88-89; Doc. 31-6 (Aff. Stadtlander at ¶2, 10)). Stadtlander oversaw the Compensation, Benefits and HRIS Team (the team) from 2014-2015, and from 2013-2016, Mosley was under his supervision and reported to him. (Id.; Doc. 1 at 6; Doc. 31-1 (Dep. Mosley at 83-84, 89); Doc. 31-6 (Aff. Stadtlander at ¶¶2, 10)). At AM/NS, the Human Resources department is comprised of Team Member Relations, Learning and Development, Recruiting, and Compensation, Benefits and HRIS. (Doc. 30 at 2; Doc. 31-1 (Dep. Mosley at 90); Doc. 31-6 (Aff. Stadtlander at ¶5); Doc. 31-8 (Dep. Stadtlander at 24)). Team Member Relations Specialists (TMRs) worked as liaisons between Team Members and Human Resources and were responsible for facilitating Human Resources and addressing concerns of Team Members. (Doc. 30 at 3; Doc. 31-1 (Dep. Mosley at 74); Doc. 31-4 (Aff. Motes at ¶4);[5] Doc. 31-6 (Aff. Stadtlander at ¶6); Doc. 31-8 (Dep. Stadtlander at 24)). Per Stadtlander, "they generally interact with our stakeholders and customers in various department to help coach through typical kind of Human Resource business partner situations, policy

---

3 Presently Stadtlander is the Director of Human Resources and Communication. (Doc. 31-6 (Aff. Stadtlander at ¶2)).

4 Per Mosley, an "author" means someone who has access to the process flows or maps and has the right to change those and access to do so. (Doc. 38-2 (Dep. Mosley at 63)).

5 Jason Motes was the Manager of Team Member Relations from 2016 until he voluntarily resigned to accept other employment in January 2019. (Doc. 31-4 (Aff. Motes at ¶2)).

2

and process questions, conflicts, things of that nature." (Doc. 31-8 (Dep. Stadtlander at 24)). The team was a subdivision of HR. (Doc. 31-1 (Dep. Mosley at 90)).

At some point, Mosley's title changed from Lead Specialist to "Rep II HRIS." (Doc. 38-2 (Dep. Dolbare at 103)). In her role, Mosley was a team member of the AM/NS Compensation, Benefits, and HRIS Team (the team).

In 2014, Defendant AM/NS Calvert, LLC (AM/NS)[6] purchased ThyssenKrupp and acquired the Calvert facility, becoming Mosley's employer. Mosley continued her position in HR as a team member. (Doc. 31-1 (Dep. Mosley at 83); Doc. 31-6 (Aff. Stadtlander at ¶2)). In this position, Mosley retained her Nimbus responsibilities and "Systems, Applications, and Products" (SAP)[7] responsibilities were added. (Doc. 1 at 4); Doc. 31-1 (Dep. Mosley at 71)). Mosley was responsible for leading the HR data function, timely and accurately reporting data, maintaining organization structure, working as the Nimbus "author," and preparing standard HR reports. (Doc. 31-1 (Dep. Mosley at 107-108); Doc. 31-3 (Aff. Dolbare at ¶6); Doc. 31-7 (Dep. Dolbare at 21-22)). Mosley's duties included, but were not limited to, heavy data entry into SAP (*e.g.*, processing of employee records relating to new hires, terminations, organizational reassignments, job changes, salary changes, and address changes. (Id. at 5). Mosley received one-on-one training in SAP. (Doc. 31-1 (Dep. Mosley at 56, 68)). Mosley also responded to requests from internal sources for various reports and information; created and

---

6 AM/NS is a steel processing plant in Calvert, AL which produces flat rolled carbon steel products for the automotive, construction, pipe/tube, service center, and appliance/HVAC industries, and is a foreign limited liability company formed in the State of Delaware and doing business in Mobile County, Alabama, and a 50/50 joint venture between ArcelorMittal and Nippon Steel Corp. (Doc. 30 at 2; Doc. 20-1 (Dep. Mosley at 49-50); Doc. 31-6 (Aff. Stadtlander at ¶2)).

7 SAP is an enterprise resource management system that houses employee data (personnel information) -- names, addresses, dates of employment, pay, changes in positions, etc. (Doc. 31-8 (Dep. Stadtlander at 90); Doc. 31-7 (Dep. Dolbare at 13)). SAP is used to manage different aspects of business including HR, finance, health, safety, and reflects changes in Team Members' status like promotion/transfer. (Doc. 31-1 (Dep. Mosley at 55-56); Doc. 31-2 (Aff. Byrd at ¶4); Doc. 31-3 (Aff. Dolbare at ¶7); Doc. 31-5 (Aff. Mead at ¶6); Doc. 31-7 (Dep. Dolbare at 13); Doc. 31-8 (Dep. Stadtlander at 89-90)).

maintained positions and organizational charts; created and maintained the HR Nimbus process and associated documents; and submitted SAP changes to ensure data integrity for "Helpdesk" and "Active Directory." (Doc. 1 at 5). Mosley used Excel to prepare "bar reports" formulated with information supplied by her supervisors/managers. (Doc. 31-1 (Dep. Mosley at 110-112)). Mosley also received training in auditing and on SAP, OrgPublisher, Excel, and had access to online training courses. (Doc. 31-1 (Dep. Mosley at 55-56, 92, 130-131, 137-140, 170-171); Doc. 31-3 (Aff. Dolbare at ¶¶10, 11); Doc. 31-7 (Dep. Dolbare at 24-25)). For her position, Mosley understood the importance of being flexible, being accurate with data, the need to audit[8] her work for accuracy to correct mistakes, and the expectation to participate in team meetings. (Doc. 31-1 (Dep. Mosley at 109-110, 112, 118-119); Doc. 31-2 (Aff. Byrd at ¶5); Doc. 31-3 (Aff. Dolbare at ¶¶8, 10); Doc. 31-7 (Dep. Dolbare at 24-25)).

In July 2016, Stadtlander was promoted to Director of Human Resources, and in September 2016, Brooke Dolbare (Dolbare) was named Team Manager. (Doc. 31-1 (Dep. Mosley at 88-89; Doc. 31-3 (Aff. Dolbare at ¶3); Doc. 31-6 (Aff. Stadtlander at ¶¶2, 10)). Dolbare reported to Stadtlander. (Doc. 31-3 (Aff. Dolbare at ¶5)). Dolbare was responsible for oversight of the team. (Id.) As of September 2016, Mosley began reporting to Dolbare. (Id. (Aff. Dolbare at ¶6)).

From September 2016 to June 2018, Dolbare supervised Mosley along with Benefits Coordinator Paula Lindsey (Lindsey), Compensation Analyst Mary Katelynn Sheffield Mead (Mead),[9]

_____

8 An audit is checking for accurate data, a system, a process procedure -- seeing if the data is what it should be. (Doc. 31-7 (Dep. Dolbare at 23)). For example, with an SAP, Dolbare describes the audit as follows: "we would receive data from a personnel action form. It would be manually inputted into the system. A report could be generated or reports were generated of the data that was inputted. So we would need to go through there and audit to ensure consistency, no errors. Maybe we take data from another system such as Ceridian, compare the two data points to ensure they match. That's one way to find any issues." (Id. (Dep. Dolbare at 24)). One could pull two reports or two sets of data and them compare them for discrepancies. (Id. (Dep. Dolbare at 24-25)).

9 Mead worked for AM/NS as a Compensation Analyst in December 2017 and voluntarily resigned in April or May 2019 to accept other employment. (Doc. 31-5 (Aff. Mead at ¶2)).

and SAP Analyst Shaye George (George).  (Doc. 31-1 (Dep. Mosley at 94, 100-102, 104); Doc. 31-3 (Aff. Dolbare at ¶6); Doc. Doc. 31-5 (Aff. Mead at ¶4); 31-7 (Dep. Dolbare at 45-47)).  Mosley and her fellow team members were located in cubicles grouped together with Dolbare.  (Doc. 31-1 (Dep. Mosley at 100)).  Team members used several systems in their positions -- Nimbus, SAP, Ceridian,[10] etc.  (Doc. 31-1 (Dep. Mosley at 67-68; Doc. 31-2 (Aff. Byrd at ¶¶4, 5); Doc. 31-3 (Aff. Dolbare at ¶7); Doc. 31-5 (Aff. Mead at 6)).  For instance, the team used SAP to show changes in a Team Member's status (raises, promotions, transfers, termination), as AM/NS had invested heavily in SAP to ensure it could properly use the system and maintain accurate data as an integral part of HR.  (Doc. 31-1 (Dep. Mosley at 56); Doc. 31-2 (Aff. Byrd at ¶5); Doc. 31-3 (Aff. Dolbare at ¶7); Doc. 31-7 (Dep. Dolbare at 13-15)).

While supervising Mosley, Dolbare observed "a number of deficiencies" in her job performance.  These deficiencies included: "trouble getting the work actually accomplished[;]" failing at times to provide accurate data and/or numbers; often failing to audit her work (even though she specifically counseled Mosley to do so); difficulty prioritizing her work (she was often overwhelmed with work tasks because she would not use her time efficiently and would waste time on unnecessary tasks); choosing not to engage with the rest of the team (turning down trainings, removing herself from OrgPublisher on which the rest of team was working, declining to participate in team activities, etc.); "adaptability based off requests[;]" and unsuccessfully communicating with others to provide information requested.  (Doc. 31-1 (Dep. Mosley at 88-89); Doc. 31-2 (Aff. Byrd at 10); Doc. 31-3 (Aff. Dolbare at ¶¶8-10, 12 and Att. 2 thereto); Doc. 31-7 (Dep. Dolbare at 32-39)).

---

10  Ceridian is a system used for payroll, and the team tried to sync information between their systems and Ceridian.  (Doc. 31-1 (Dep. Mosley at 57-58); Doc. 31-7 (Dep. Dolbare at 15)).

Dolbare made multiple efforts to assist Mosley improve her job performance: encouraging her to attend offered trainings, speaking with her numerous times about how to improve, instructing her multiple times on how to use Vlookup in Excel, which would expedite her ability to complete her job tasks. But despite this counseling "she would continue to struggle and/or forget how to do the lookup and continue to do things manually, which took more time and was inefficient[.]" (Doc. 31-3 (Aff. Dolbare at ¶11)). Dolbare also did not assign Mosley more job tasks than others on the team, but instead, "there were times when I removed duties at Ms. Mosley's request." (Id. (Aff. Dolbare at ¶9)). As for communication, Dolbare explains that when asked a question, Mosley would not answer the question at issue but provide numbers that were non-responsive. (Id. (Aff. Dolbare at ¶12)). This was problematic, as her role as HRIS Specialist meant that she was responsible for communicating with others regarding personnel data, and if she could not provide accurate responses, the team could not rely on her. (Id.) Dolbare observed Mosley's failure to provide accurate information in response to requests (*e.g.*, errors in headcount information to be provided to executive leadership). (Doc. 31-1 (Dep. Mosley at 119-125, 133-134); Doc. 31-3 (Aff. Dolbare at ¶8); Doc. 31-4 (Aff. Motes at ¶9); Doc. 31-5 (Aff. Mead at ¶7); Doc. 31-6 (Aff. Stadtlander at ¶16 and Att. 5)). Dolbare and others also had to repeatedly assist Mosley with questions and provide help to her. (Doc. 31-1 (Dep. Mosley at 71-72, 134-136, 171-173); Doc. 31-2 (Aff. Byrd at ¶¶7, 11-12); Doc. 31-3 (Aff. Dolbare at ¶11); Doc. 31-5 (Aff. Mead at 8)). Moreover, Dolbare informally requested that Mosley audit her work periodically, which Mosley failed to do. (Doc. 31-1 (Dep. Mosley at 117-119, 132-133); Doc. 31-3 (Aff. Dolbare at ¶8); Doc. 31-5 (Aff. Mead at 5)). Other issues Dolbare noted included that Mosley questioned her about her need to participate in OrgPublisher and eventually removed herself from the project; and the need to attend meetings and/or calls about OneHRIS for which the team was responsible. (Doc. 31-1

(Dep. Mosley at 125-132, 145-148, 169); Doc. 31-3 (Aff. Dolbare at ¶¶10, 11, 13); Doc. 31-7 (Dep. Dolbare at 33-36)).

At some point in 2016, Mosley reported to Stadtlander that she suffered from IBS-D, via a handwritten note and conversation.  (Doc. 31-1 (Dep. Mosley at 106-107)). See also Doc. 31-6 (Aff. Stadtlander at ¶19)). Dolbare was also aware because from time to time, after she became her manager, Mosley texted her to notify her that she would be late to work due IBS-D symptoms.  (Doc. 31-1 (Dep. Mosley at 107, 204); Doc. 31-3 (Aff. Dolbare at ¶16)).

In March 2017, Mosley received a 2016 GEDP (performance evaluation for her work in 2016)[11] completed by Stadtlander which found as follows:

- she exceeds expectations working with TMRs to determine a more fixed organization structure;
- she was on track and fully meets expectations with identifying gaps in HR processes and is "doing a good job to fix the current structure within Org Mgr to match the actuality of the organization[;]"
- she fully meets expectations and has continued to play a key role in auditing for the year;
- she fully meets expectations and was on track to identify gaps in HR systems like SAP and communicate those to IT and has been very active in identifying gaps/requesting IT support;
- she exceeds expectations with assisting with the transition of new TMRs from HRIS/Nimbus perspective and has completed this goal, and volunteered and followed through with this;
- she has worked hard to support changes in the company including being flexible in an environment that does not lead itself to classic structure;
- for decision making, she has made "good gains in her confidence to suggest solutions and make decisions. Continue to work in this area[;]"
- for results orientation, to continue to push for change and drive efficiency;
- for strategic thinking, she thinks outside the box;
- for teamwork, she is a good member of the team, volunteering to help anyone regularly;
- for stakeholder orientation, she tries to understand her customer needs and work for solutions that fit within the processes et still helps them achieve their goals;
- for effective communication, she has good verbal/written skills, but a great place to gain is to continue to make the technical pieces easier to understand to the non-technical people and "convey information and not data when appropriate...be sure to fully understand what the receiver/requester is asking[;]"

---

11 A GEDP is a Global Employment Development Plan. At the end of each year, a team member and their manager outline objectives for the upcoming year and then track progress of the previous years' goals.  The team member rates themselves and the manager rates them. Thereafter, the manager and team member discuss his/her progress and objectives.  (Doc. 31-7 (Dep. Dolbare at 106, 108)).

- for learning and development, she is happy to share her knowledge[;] and
- has potential to contribute in analytical way in the future to improve company efficiencies.

(Doc. 31-1 at 183-189). (Doc. 31-1 (Dep. Mosley at 113-116); Doc. 31-6 (Aff. Stadtlander at ¶11)). Per Mosley, she does not recognize the document, has not seen it, and is "contending it's not an authentic document[]" because the section where her comments are shown "are not mine."  (Doc. 31-1 (Dep. Mosley at 115-116)).

According to Stadtlander, while supervising Mosley, he had various discussions with her about her job duties and responsibilities, which evolved and changed as the company moved from a start-up to actually being in operation. Some of Mosley's duties were reduced while additional duties were added: "[s]he was not assigned additional duties as punishment or in any effort to push her out of the company. Rather...[she was ] expected to adapt to the changing needs of the organization throughout her employment,"  (Doc. 31-6 (Aff. Stadtlander at ¶14)).  "I did not observe" that Mosley "was tasked with more job duties than others" or "subjected to different expectation than others[]" and instead, "it was my observation....that she was given more one-on-one assistance and attention than others on the team."  (Id. (Aff. Stadtlander at ¶15)).   Regarding Mosley's performance, Stadtlander noted she struggled at times to accomplish or finish tasks, failed to provide accurate information on a regular basis, had difficulty prioritizing tasks (focusing on irrelevant topics rather than her job), and had certain performance deficiencies, (Id. (Aff. Stadtlander at ¶¶16-20 (and Att. 4 thereto))).

In July 2017, Mosley began wearing a splint on her hand due to basal thumb osteoarthritis, which caused pain in her thumb and hand and for which she took over the counter medication.  (Doc. 1 at 6; Doc. 31-1 (Dep. Mosley at 190-192)).  Dolbare was aware of this.  (Doc. 31-7 (Dep. Dolbare at 116)).  "I know that she struggled with her hand. I don't know as far as limited use ... she had a splint...that would make it a little more difficult[]" and a big part of her job was using a keyboard with both hands.  (Id. (Dep. Dolbare at 117)).  Mosley also told Dolbare that the problem with her hand

8

made her ability to complete her work difficult: "[s]he expressed that[]" -- "[i]t would just take her additional time. But she never asked us to do anything different for her to perform her tasks." (Id. (Dep. Dolbare at 117-118)).  On July 20, 2017, Dolbare emailed Mosley to tell her to "make a reminder to audit at least once per month[.]" (Doc. 31-1 at 190). Also at that time, Dolbare emailed herself Manager Notes stating that she had found more than 12 issues with reporting structures and changes that Mosley should have audited as part of her role.  (Doc. 31-3 at 36).

In August 2017,[12] Mosley received a steroid injection in her left thumb. (Doc. 31-3 (Dep. Mosley at 191)).  Dolbare was aware that she received injections.  (Doc. 31-7 (Dep. Dolbare at 116)). On August 4, 2017, Dolbare emailed herself Manager Notes stating that she had given Mosley a project with a set due date but she did not finish it and acted as if she did not even know of the due date: "she should know the appropriate questions to ask in order to complete the job. I spoke with her and let her know the expectations was to complete the assignment and she should have made sure she asked the right questions well before now. She also declined SAP training that was planned for her growth. She couldn't take 1 hour for the class because she needed to finish the project." (Doc. 31-3 at 35).

At times, Mosley discussed her workload with Stadtlander but does not recall specifics or follow-up. (Doc. 31-1 (Dep. Mosley at 213-215); Doc. 31-4 (Aff. Motes at ¶10); Doc. 31-6 (Aff. Stadtlander at ¶15); Doc. 31-7 (Dep. Dolbare at 48-49)).  Also in August 2017, Mosley requested that managers Stadtlander and Motes meet with she and Dolbare, but she does not recall the details of the meeting or why she asked to have one.  (Doc. 31-1 (Dep. Mosley at 152-153); Doc. 31-4 (Aff. Motes at ¶10)).

From August 22-24, 2017, emails were exchanged among Mosley, Dolbare, Stadtlander, Motes and others, regarding tasks handled by Mosley and asking her to double check some items and correct

---

12 Mosley's reference to this as August 2018 is apparently a typographical error.

errors.  (Doc. 31-1 at 191-205; (Doc. 31-4 (Aff. Motes at ¶10)).  Mosley stated, in an August 23, 2017 email, that she had previously tried to explain that her duties are more than one full time position and that she is doing her very best to accommodate all the daily requests.  (Doc. 31-1 at 191).  And Mosley added a request to be removed from Org Publisher questioning its value with regard to her duties.  (Id.) Motes was made aware of Mosley's failure to timely complete updates in Nimbus and based on his own interactions with her, noticed deficiencies in her performance.  (Doc. 31-4 (Aff. Motes at ¶¶8-10)).  Mosley complained to Motes about her workload but did not request help, instead "her concerns were those that you would express to a peer about your workload in general[]" and "I did not observe that Ms. Mosley was tasked with more work responsibilities and/or tasks than others on the team."  (Id. (Aff. Motes at ¶10)).

On August 25, 2017, Dolbare notified Mosley of a meeting with her manager and direct report to discuss work and projects, attaching the issues and concerns resolution policy; Mosley requested that Stadtlander and Motes attend the meeting.  (Doc. 31-1 at 206-207).  And from September 21-28, 2017, emails were exchanged among Mosley, Dolbare, Stadtlander, and others, regarding audit results, correcting discrepancies by auditing, for Mosley to "add to your calendar a monthly audit of pay rates ... cost centers...and any other data points[,]" correct pay rates, discussing starting monthly audits, an account being disabled, etc.  (Doc. 31-1 at 197-200).

On December 7, 2017, Mosley requested leave under the Family Medical Leave Act (FMLA) to begin December 29, 2017, for surgery on her left hand due to arthritis (trapeziectomy), resulting in a bone being taken out of the base of her thumb and replaced with a ligament.  (Doc. 1; Doc. 5 at 8 (Answer); Doc. 31-1 (Dep. Mosley at 190-191, 193-194); Doc. 31-7 (Dep. Dolbare at 118-119)).  Paula Lindsey (Lindsey) handled Mosley's FMLA request, and her leave was approved.  (Doc. 1 at 6-7; Doc. 31-1 (Dep. Mosley at 194)).  Prior to going on leave, Mosley prepared a task list for Dolbare and others,

and Dolbare ensured her that her responsibilities would be divided up among the team.  (Doc. 31-1 (Dep. Mosley at 196-197; Doc. 31-1 at 227-233).

Per Mosley, before her leave, Dolbare placed unreasonable demands on her, such as being assigned 250 exceptions to manually input/type into the system, even though two (2) other employees were available to assist with those exceptions.  (Doc. 1 at 7; Doc. 31-7 (Dep. Dolbare at 119)).  Dolbare disputes this.  Per Dolbare, "[s]he did have exceptions to enter into the system ... annual exceptions[]" but "it was [not] prior to her leave[]" explaining that each year there were vacation exceptions so "we ... knew all year there were vacation exceptions. There is a particular time in which you enter them which tends to be towards the end of the year...they were *known* [versus new] exceptions unrelated to her leave."  (Doc. 31-7 (Dep. Dolbare at 119-120 (emphasis added))).  Thus, Dolbare did not assign any *new* exceptions to Mosley at that time -- such existed *prior* to her leave request and was an *ongoing* task.  (Id. (Dep. Dolbare at 120)).  Regardless, Mosley told Dolbare that she would finish entering all the exceptions before taking FMLA.  (Doc. 31-7 (Dep. Dolbare at 120-121)).  This did not happen.

In February 2018, Motes was included in an email with Mosley and other HR and Payroll members regarding vacation exceptions that Mosley had failed to complete before taking leave.  (Doc. 31-4 (Aff. Motes at ¶9)).  On February 21, 2018, Mosley returned to work with pain, a splint on her left hand, and medically imposed restrictions which required accommodation to work (wearing the splint, no lifting with her left hand, no climbing, no vibratory tools, and no repetitive heavy gripping); she was able to perform her job functions "but it was with a lot of pain still."  (Doc. 1 at 7-8; Doc. 31-1 (Dep. Mosley at 190, 193)).  Mosley requested, and was granted, accommodation for the work restrictions.  (Doc. 31-1 (Dep. Mosley at 201-202); Doc. 31-3 (Aff. Dolbare at ¶16); Doc. 31-7 (Dep. Dolbare at 116-118, 121); Doc. 31-7 at 72).  Mosley also requested the accommodation of intermittent FMLA medical leave for follow-up medical treatments and occupational/physical therapy, which was

11

granted.  (Doc. 5 at 9-10 (Answer); Doc. 31-1 (Dep. Mosley at 191-193, 202, 250); Doc. 31-3 (Aff. Dolbare at ¶9)).  Dolbare states that she ensured that new tasks were not added to her workload while Mosley was recovering.  (Doc. 31-3 (Aff. Dolbare at ¶9)).

However, Mosley tells a different story.  Mosley alleges that upon her return, Dolbare expressed exasperation at her requests for accommodation and medical appointments by "[j]ust a sigh[,]" and expressed the desire to remove her from her position by commenting "[t]here needs to be an Analyst in your position[]" and she "had better see some improvement" in her job performance, which Mosley "felt ... a threat."  (Doc. 1 at 8; Doc. 31-1 (Dep. Mosley at 127-128, 181, 192-200); Doc. 38-2 (Dep. Mosley at 251)).  "I felt I was being pushed out of my role because they actually wanted an analyst [with SAP technical expertise] in my position."  (Doc. 31-1 (Dep. Mosley at 181-182, 200)).  Mosley also felt that Dolbare's work expectations were unreasonable as she was recovering from hand surgery, had work restrictions, and her work involves her hands.  (Id. (Dep. Mosley at 200-201)).

In contrast, Dolbare testified "[t]hat's not exactly what I said[;]" rather, we "discussed the role evolving...there are analysts in other units ... those were some of the opportunities we talked about for her to develop her skill set."  (Doc. 31-7 (Dep. Dolbare at 127)).  "[W]e were implementing new systems ... the company evolved ... we had to learn how new systems worked...it was really just about evolving our learning as the company evolved."  (Id. (Dep. Dolbare at 127-128)).  Dolbare communicated to Mosley that she saw the evolution of Mosley's role as continuing as an HRIS Specialist but being more involved in analytical type work.  (Id. (Dep. Dolbare at 128)).

Additionally, upon her return to work, Mosley discovered that certain data/information had not been processed while she was on leave.  Per Mosley's speculation, Dolbare intentionally left all the new hire data unprocessed -- to accumulate during her absence -- for her to input and she directed such to be left for weeks, if not months (including new hire dates of January 8, January 29, February 12,

and February 19).  (Doc. 1 at 8-9; Doc. 31-1 (Dep. Mosley at 198)).  Specifically, Mosley was left to complete tasks such as assigning the exceptions for the 2018 vacation, the data entry items from new hire orientation, and banking and address updates from the payroll team.  (Doc. 38-1 (Decltn. Mosley at ¶55)).  This work resulted in her going home with her thumb and index finger shaking from overuse. (Id.)  However, Mosley also testified that certain tasks were not completed because "with three people there they didn't have the time[]" given their own job responsibilities. Doc. 31-1 (Dep. Mosley at 199)).

Dolbare explained that while Mosley was out on leave, she and the team were unable to address the vacation exceptions -- one of Mosley's duties -- because they had to perform their own duties too. (Doc. 31-1 (Dep. Mosley at 197-199); Doc. 31-3 (Aff. Dolbare at ¶17); Doc. 31-5 (Aff. Mead at 12); Doc. 31-7 (Dep. Dolbare at 119-121)).  Accordingly to Dolbare, the team distributed Mosley's workload while she was out and work was not deliberately left for her to have to do upon her return. (Doc. 31-7 (Dep. Dolbare at 128); Doc. 31-5 (Aff. Mead at ¶12)).  Dolbare testified: "[w]e did not intentionally leave duties" for her when she returned and "[i]n fact, when Ms. Mosley returned ... I ensured that no new or additional duties were added to her workload to accommodate the limited restrictions set out by her healthcare provider."  (Doc. 31-3 (Aff. Dolbare at ¶17)).

Moreover, Mosley alleges that Dolbare embarrassed and humiliated her in front of her coworkers by making derogatory comments about her work and subjecting her to constant micro-management.  Mosley states that Dolbare began going through her work to find deficiencies in her performance and tried to turn other team members against her, and had her co-worker Mead watch her (e.g., when Mead observed Mosley make one error related to SAP, Mead exclaimed "BAM!, you know, like she meant in your face[]").  (Doc. 1 at 9; Doc. 31-1 (Dep. Mosley at 158, 182-187, 210-211, 259-260)).  However, Mosley does not remember any specific derogatory comments, only "the way I felt. I felt inferior."  (Doc. 31-1 (Dep. Mosley at 259))  Mosley never heard Dolbare ask Mead to watch

13

her, but just believed such because of "the numerous comments about errors ... they [Dolbare and Mead] were counting every single error I made."  (Id. (Dep. Mosley at 260)).  "[I]t was more the attitude [of superiority] that I felt from her [Mead] that led me to believe[]" this.  (Doc. 31-1 (Dep. Mosley at 159-160)).

Dolbare testified that she has no knowledge of Mead monitoring Mosley.  (Doc. 31-7 (Dep. Dolbare at 134)).  And according to Mead, Dolbare never asked her to watch Mosley or assess how she performed her job, or even her opinion on same.  (Doc. 31-5 (Aff. Mead at ¶10)).  However, Mead states there were times when Mosley made an error that she caught, and she would point it out as part of a team effort to provide accurate data to leadership in the company (not to embarrass her), but she never said "Bam!".  (Id. (Aff. Mead at ¶7-8, 10)).  Mead independently observed, through her interactions with Mosley, that she often made errors that could have been caught by auditing -- e.g., she would frequently enter the wrong type of action in SAP which would negatively impact reports generated from SAP, and she forgot how to perform VLookup in Excel even though she showed her multiple times, etc.  (Id.)

Another team member, Karen Byrd (Byrd), worked as Team Manager of Governance in 2018 and currently is the Manager of SAP Project Services.  (Doc. 31-2 (Aff. Byrd at ¶2)).  Byrd provided technology support for HR related to SAP, and so worked closely with individuals in the Compensation, Benefits, and HRIS Team, which included Mosley.  (Id. (Aff. Byrd at ¶¶5-6)).  Byrd explains as follows: she gave Mosley guidance on SAP issues on a regular basis, sometimes daily, in response to her requests for assistance, and did everything within her abilities to assist her and provide her with the necessary support to do her job.  (Id. (Aff. Byrd at ¶7)).  Byrd never observed Mosley denied training or support, and believes she was given more training than others in HR because she would ask for follow-up training or have questions about prior training.  (Id.)  Byrd observed the

14

interactions between Mosley and Dolbare and never observed Dolbare act unprofessionally and Mosley never raised complaints to Byrd about Dolbare.  (Id. (Aff. Byrd at ¶9)).  As for Mosley's job performance, Byrd observed that she failed to demonstrate attention to detail in her work, and that if given specific steps to a process could follow those steps but if asked to do so again, without guidance she would struggle to remember what she needed to do (e.g., VLookup on Excel).  (Id. (Aff. Byrd at ¶10).  Per Byrd, Mosley often asked her for assistance, but also would reference her workload as the reason she could not perform another task.  (Doc. 31-2 (Aff. Byrd at ¶11)).  Mosley, at times, failed to do her own legwork or research before asking Byrd for assistance.  (Id. (Aff. Byrd at ¶12)).  Byrd observed a number of errors by Mosley when she tried to enter new hires into Ceridian -- that she had provided inaccurate data to payroll more than once.  (Id. (Aff. Byrd at ¶13)).  Per Byrd, Mosley struggled with managing her workload, but the overall expectations for her were reasonable and were no greater than those for other team members.  (Id. (Aff. Byrd at ¶14)). Byrd summarizes: "It was evident to me, from my interactions with Ms. Mosley, that she needed one-on-one attention in order to be able to successfully fulfill her job duties as an HRIS Specialist."  (Id. (Aff. Byrd at ¶14)).

At some point Mosley talked with Team Manager Relations representatives Jeremy Doggette (Doggette) and Robertson, telling Doggette about "the harassment I felt[]" and that "I felt like I was being micromanaged[]" because they were "documenting every error I made when the same ...wasn't ... [happening to] ... others[]" like Mead, Dolbare, and Shay George who made SAP errors (typos) which she corrected but did not report.  However, Mosley does not remember the specifics of the conversation.  (Doc. 31-3 (Dep. Mosley at 182-187)).  Mosley added that Dolbare made her own errors -- "the same issues...wrong information[]" like typos.  (Id. (Dep. Mosley at 186-187)).

In March 2018, Dolbare issued Mosley a 2017 GEDP (assessing her 2017 work performance) finding as follows:

- for identifying gaps in HR processes, she was on track and fully met expectations, noting she works to ensure processes are up to date and is aware of changes in the department workflows but there "is opportunity to ensure process and feedback is update[]d ... timely ... in Nimbus[;]"
- for identifying gaps in HR systems like SAP and communicating gaps/needs to IT, this was postponed and she somewhat met expectations, noting there are many opportunities to identify gaps and with the HRIS projects and "Donna did participate in testing and mapping. However she stepped aside on the ORg Publisher project and was challenged with the OneHRIS project management. In this role, the expectation is that data is audited regularly and system flaws are not only found proactively but identified and solutions given[;]"
- for participating in value plan activities, she attended a session/multiple ideations sessions;
- for increasing effectiveness of HRIS processes to support organizational improvement and consistency, she was on track, somewhat met expectations, and it was noted that she requested not to be involved with Org Publisher, the integration with OneHRIS had been completed successfully and "Donna assisted with the testing and movements needed for this process. She has interfaced with the corporate team. She has found it difficult to participate in these projects while maintaining regular workload[;]"
- with assisting with capturing regrettable attrition data, work was conducted on this and she made recommendations on where to capture the information on SAP;
- with scheduling/completing advanced Excel classes, she completed this course but is "still challenged by utilizing VLookup[13] in her every [] day task. This is a skill that would expedite her work" and was below expectations;
- for change management, she seeks to improve processes and recognizes the change her work may cause for others on the team;
- for decision making, she "has improved on knowing when to make a decision independently and when to seek manager input[;]"
- for results orientation, she "recognizes the opportunity to improve her performance. She can improve this competency by seeking task through to completion in a timely manner[;]"
- for strategic thinking, she considers the impact of her daily activities on company strategies/goals;
- for teamwork, she is willing to help others, shows respect for those in her immediate group and outside the HR unit;
- for stakeholders orientation, she demonstrates an understanding of those needs, considers impact on stakeholders when making changes in systems/workflows;
- for effective communication, she provides information in concise and accurate manner, an effectively cascade information to the team, but "an opportunity for improvement is not only communicating but listening and interpreting request cautiously and with intent of directly answering the question with appropriate data[;]"
- with learning and development she is willing to attend training when time permits; and
- the importance of SAP training was discussed and she has made good progress in researching

---

13 VLookup is a formula in Excel. (Doc. 31-7 (Dep. Dolbare at 25)).

SAP courses to increase knowledge and this will be a good opportunity to expand knowledge in all areas of HR.

(Doc. 31-1 at 208-219). <u>See also</u> (Doc. 31-1 (Dep. Mosley at 166-169); Doc. 31-3 (Aff. Dolbare at ¶12-13); Doc. 31-7 (Dep. Dolbare at 105-108)).  It was noted that Mosley maintained her daily reporting and was willing to help others on the team, but with the addition of multiple projects struggled to maintain her workload.  (Doc. 31-1 at 215). The review concluded that: "The expectation is an improvement in performance, Accuracy, speed of work, ability to participate in project work as needed are expected of the HRIS role."  (<u>Id</u>.)

Mosley was provided with the opportunity to respond and she did.  Mosley stated she felt she was not adequately trained for the Org Publisher project, that she has been micromanaged and disrespected by Dolbare.  (Doc. 31-1 at 215-216).  In reply on April 3, 2018, Mosley was told by Dolbare that if there was no improvement in accuracy and efficiently "in the following weeks" a formal performance improvement plan (PIP) "would follow."  (<u>Id</u>. at 216-219).

On April 13, 2018, Mosley experienced pain in her chest, right shoulder, and right arm while at work and was taken by ambulance to Springhill Memorial Hospital, where she remained overnight for cardiac enzyme monitoring.  (Doc. 1 at 11; Doc. 31-1 (Dep. Mosley at 204-205); Doc. 31-5 (Aff. Mead at ¶13)).  Mosley's doctors told her she required a cholecystectomy (gall bladder surgery). Mosley informed AM/NS that she would require surgery on May 22, 2018 and would need additional FMLA leave, which was approved.  (<u>Id</u>.; Doc. 31-1 (Dep. Mosley at 205-206; Doc. 31-3 at 71-72)). The surgery, however, made her IBS more difficult.  (Doc. 31-1 (Dep. Mosley at 206)).

On May 29, 2018, Mosley returned to work and verbally requested to Dolbare the accommodation of having her workspace moved closer to the bathroom due to gastrointestinal emergencies exacerbated from the loss of her gall bladder.  (Doc. 1 at 12; Doc. 31-1 (Dep. Mosley at 206-207); Doc. 31-6 (Aff. Stadtlander at ¶20); (Doc. 31-4 (Aff. Motes at ¶¶11)); Doc. 31-3 (Aff.

Dolbare at ¶18)).  Mosley asserts Dolbare refused her request. (Doc. 31-1 (Dep. Mosley at 207-208); Doc. 38-1 (Decltn. Mosley at ¶¶59, 61)).  "I felt discriminated against when Ms. Dolbare denied me what was an obvious and unburdensome request. It was humiliating to have to explain the request to her[.]"  (Doc. 38-1 (Decltn. Mosley at ¶63)).  Perceiving her request as having been refused by Dolbare, Mosley went to the TMRs about her workspace request to move her desk.  (Doc. 31-1 (Dep. Mosley at 208)).  Mosley reported Dolbare's denial to Motes and Doggette, which entailed her explaining the "embarrassing and humbling" reasons for a workspace near the bathroom.  (Doc. 1 at 12-13; Doc. 31-1 (Dep. Mosley 208-210); Doc. 31-3 (Aff. Dolbare at ¶18); Doc. 31-4 (Aff. Motes at ¶11); Doc. 31-6 (Aff. Stadtlander at ¶20)).  Mosley was granted her accommodation by Dolbare the same day she requested it.  Mosley claims that Dolbare observed her report the denial to management and then changed her mind due to same.

However, rather than refusal, Dolbare asserts that told Mosley she would consider the request: "I did not refuse her request[]" but her concern with moving her workstation was "she would be away from our team and would miss out on team interaction and discussions....I did not dismiss or rule out her request outright."  (Doc. 31-3 (Aff. Dolbare at ¶18)). Dolbare did not initially think they could accommodate the request because she wanted her sitting with the team, she was trying to make sure she was following the process, and she did not see that accommodation in Mosley's return to work paperwork. [14]  (Doc. 31-7 (Dep. Dolbare at 148); Doc. 31-1 (Dep. Mosley at 207-210); Doc. 31-3 (Aff. Dolbare at ¶18); Doc. 31-4 (Aff. Motes at 11); Doc. 31-6 (Aff. Stadtlander at ¶20)).  So after receiving Mosley's request, Dolbare spoke with Motes and Stadtlander, a "step that I would normally take if I had a question or concern about how to handle" a team member's request and "[i]n consulting with"

---

14 No physician made that recommendation to Mosley, she just felt she would be more comfortable at work because of her IBS-D symptoms.  (Doc. 31-1 (Dep. Mosley at 207-208)).

them "we agreed that I should accommodate" the request even though they lacked a medical provider's note indicating such was necessary.  (Doc. 31-3 (Aff. Dolbare at ¶18); Doc. 31-7 (Dep. Dolbare at 148-149); Doc. 31-6 (Aff. Stadtlander at ¶20)).  "We did so promptly. No other requests for accommodation were made by Ms. Mosley to me." (Id.)  Dolbare was not corrected or reprimanded by Stadtlander or others for how she handled Mosley's request. (Id.)  Stadtlander agreed in the decision to allow Mosley to move her workstation.  (Doc. 31-6 (Aff. Stadtlander at ¶20)).

In June 2018, Mosley received a mid-year GEDP review (for a portion of her 2018 work performance) which found as follows:

- for promoting health and safety, she was on track; and
- for supporting performance driven cultures, she was behind/at risk,

(Doc. 31-1 at 222-225; Doc. 31-3 (Aff. Dolbare at ¶15). Mosley presumed that the 2018 mid-year review had been drafted by Dolbare, in response to which she submitted comments after first sending them to TMR Robertson on June 17th. (Doc. 31-1 (Dep. Mosley at 173-178, 211-220); Doc. 31-3 (Aff. Dolbare at ¶15); Doc. 31-4 (Aff. Motes at ¶¶11-12); Doc. 31-7 (Dep. Dolbare at 136-137, 138-150); Doc. 31-6 (Aff. Stadtlander at 20)).  Mosley "specifically wanted to meet with Queen [Robertson] about what I thought was retaliation and bullying or harassment issues." (Doc. 31-1 (Dep. Mosley at 179)).  Mosley emailed TMR Robertson, requesting to speak with her about these complaints and scheduled a June 18, 2018 meeting. (Id. (Dep. Mosley at 179, 213, 218); Doc. 31-1 at 221). Subsequently, Mosley submitted comments in response to the review and sent a copy to Robertson (Doc. 31-1 at 223-224; Doc. 31-1 (Dep. Mosley at 218)).  In sum, Mosley stated that her supervisor did not understand how long tasks require and that she did not have time to complete the assigned tasks. (Id.)  Mosley concluded that her supervisor was setting her up to fail. (Id.)  Mosley also alleged FMLA retaliation. (Doc. 31-1 (Dep. Mosley at 217-218)).  Dolbare did not see any of Mosley's comments until after she issued her the PIP in June 2018. (Doc. 31-3 (Aff. Dolbare at ¶15)).

19

Mosley met with Robertson, and reiterated her complaints of retaliation and discrimination, which she felt were "dismissed" because "[s]he seemed totally unconcerned about my complaints of retaliation and harassment, bullying[]" "because she didn't address it."  (Doc. 31-1 (Dep. Mosley at 219-220)).  Mosley did not ask Robertson to take specific steps because she felt it was Robertson's responsibility to do that.  (Id. (Dep. Mosley at 220)). Thereafter, Mosley believes that Dolbare intensified scrutiny of her work and was "looking for reasons to criticize and discipline" her.  (Doc. 1). Per Mosley, the "dismissive treatment she received from Team Member Relations [Robertson] evidenced that future complaints would be futile and she had nowhere else to go for help."  (Doc. 1 at 19; Doc. 38-1 (Decltn. Mosley at ¶74)).

Per Dolbare, after Mosley's GEDP in March 2018 "her performance failed to improve in any significant way ... I determined that she needed to be placed on a ...PIP[.]"  (Doc. 31-3 (Aff. Dolbare at ¶19); Doc. 38-3 (Dep. Dolbare at 79)).  "[T]he purpose of a PIP is to identify and highlight deficient areas of performance and provide specific goals to enable the Team Member to improve his or her job performance. If a Team Member successfully completes the PIP, he or she will remain employed. If the Team Member fails to successfully complete the PIP, then the time[frame] for the PIP may be extended and/or the Team Member's employment may be terminated. However, the fact that a Team Member is issued a PIP does not mean that Team Member will, in fact, be terminated. It is up to the Team Member to improve ... job performance and determine what will happen ..." (Id.)

According to Dolbare, there were multiple work deficiencies committed by Mosley in 2017 and 2018 including her ability to get things done, accuracy, auditing issues, prioritizing work, adaptability based off requests, and communication with internal and external clients/customers ("customers" were mostly internal company employees). (Doc. 31-7 (Dep. Dolbare at 32-35, 37)).  For training, there were ample opportunities for SAP training which Mosley had requested and some were

free but she did not take advantage of them citing her workload, yet others on the team did.  (Id.)  For accuracy, relating to a request for a headcount and inaccurate information was sent to the CEO because she had not checked her work (accuracy/auditing).  (Id. (Dep. Dolbare at 34-35)).  For prioritizing, internal logistics changes were required to be made by a certain date and while Mosley assured her that she would finish by the deadline and even declined training to do so, they were still not completed in time.  (Id. (Dep. Dolbare at 35)).  For communication, when Mosley was asked by Stadtlander how many females are in the organization, rather than provide a number she sent a list of all the females. (Id.)  "You would have to keep asking questions to finally get to what you needed." (Id. (Dep. Dolbare at 39)).

On June 14, 2018, Dolbare emailed Robertson, Motes, and Stadtlander a draft PIP, and discussed issuing a PIP for Mosley, stating "unfortunately, it is time to address not only performance but behavior concerns." (Doc. 31-3 at 85-86; Doc. 31-6 (Aff. Stadtlander at ¶21); (Doc. 31-4 (Aff. Motes at ¶¶13); Doc. 31-3 (Aff. Dolbare at ¶21)).  Motes and Stadtlander agreed with Dolbare's decision to place Mosley on a PIP. (Doc. 31-3 at 85; Doc. 31-4 (Aff. Motes at ¶13); Doc. 31-6 (Aff. Stadtlander at ¶21)).

On June 22, 2018, Dolbare, with Robertson present, met with Mosley and presented her with the Performance Improvement Plan (PIP), to last 90 days with "check ins" every 30 days.  At the meeting neither Dolbare nor Robertson told Mosley she would be terminated, and Mosley does not recall anyone saying anything about her medical condition, medical leave, and/or age.  (Doc. 31-1 (Dep. Mosley at 223-224, 235-236); Doc. 31-3 (Aff. Dolbare at ¶¶19-22, 25); Doc. 31-4 (Aff. Motes at ¶17); Doc. 31-7 (Dep. Dolbare at 78-80)).  Dolbare avers "I had no plans to terminate her employment or to recommend termination of her employment when I issued her the PIP." (Doc. 31-3 (Aff. Dolbare at ¶22)).  Moreover, other employees have successfully completed PIPs and remained

employed.  (Doc. 31-1 (Dep. Mosley at 240); Doc. 31-6 (Aff. Stadtlander at ¶22); Doc. 31-7 (Dep. Dolbare at 152-153)).

However, Mosley, then 61 years old, was not happy with the PIP, did not agree with the content, and did not believe it was deserved.  (Doc. 31-7 (Dep. Dolbare at 157); Doc. 31-1 (Dep. Mosley at 234); Doc. 1 at 16).  Mosley asserts that the PIP misrepresented several aspects of her job performance, included many duties which were not normally required of her, and did not include clear benchmarks or objective criteria for evaluation.  (Doc. 1 at 15, 17).  For instance, the PIP directed her to "find ways to be productive," demanded busy-work that would detract from her productivity (*e.g.*, requiring her to make lists of tasks completed), contained unreasonable expectations that could not be met in the timeframe provided, demanded that she have no errors in a bar report and no more than one (1) error in the processing of SAP maintenance ("an impossible requirement due to the nature of work[]"), contained subjective criteria that could not be objectively assessed and would allow Dolbare to manipulate the results, and was the equivalent of "do better" without any clear direction or how to accomplish such. (Doc. 31-3 (Dep. Mosley at 200, 231, 233-234)).  As to the specific measurables outlined in the SAP for Mosley to accomplish in the timeframe given, "I believe that my supervisor lacks complete understanding and knowledge of the time it takes to complete assigned tasks[]" and "she doesn't understand the time constraints that I have in SAP ... SAP and Nimbus duties were more than one full-time position. That's something that they [Stadtlander and Dolbare] did not understand." (Doc. 31-1 (Dep. Mosley at 231, 234)).  And most significantly, in Mosley's mind, the PIP was an effort to create a paper trial to fire her, a tool to make working conditions so intolerable that she would quit, and a tool to manage her out of her job due to her age, health, and related requests for accommodations and/or complaints.  (Doc. 1 at 18).  Per Mosley's speculation, AM/NS used PIPs to "manage out older employees[]" and "create documentation to justify terminating" employees.  (Doc.

1 at 15-16).  Mosley asserts, "[i]t was not reasonable to create/issue a ... [PIP]...during my ongoing recovery of two major surgeries within a 6-month period[]" as "it was obvious I was limited in my ability to use my a hand and/or work at full capacity[.]"  (Doc. 38-1 (Decltn. Mosley at ¶¶67-68)).

On June 25, 2018, Mosley submitted a letter to Dolbare, Stadtlander, and Robertson -- by delivering same to Motes -- stating that she was submitting her "immediate, involuntary resignation, under duress, due to the undue stress and hardship that the Personal Improvement Plan (PIP) would place upon me, physically, with respect to my ongoing recovery from the effects of my recent cholecystectomy."  (Doc. 31-1 at 234; Doc. 31-1 (Dep. Mosley at 237-240; Doc. 31-3 (Aff. Dolbare at ¶22); Doc. 31-4 (Aff. Motes at ¶15): Doc. 31-6 (Aff. Stadtlander at ¶22)).  "The stress from trying to complete my tasks while trying to recover from that last surgery was duress[]" and "I felt that with IBS stress makes the situation worse. This [the PIP] I considered mega stress."  (Doc. 31-1 (Dep. Mosley at 239-240)).  Per Mosley, "I felt I was being forced to leave."  (Id. (Dep. Mosley at 241)).

On July 2, 2018, Stadtlander issued a letter to Mosley accepting her resignation and stating the company's disappointment, adding that while "we have no choice but to accept your resignation, you were considered a valuable Team Member....We regret that you felt that you had to voluntarily resign, as there was certainly no pressure for you to do so and no intention to end your employment on the part of AM/NS Calvert."  (Doc. 31-6 at 41; Doc. 31-6 (Aff. Stadtlander at ¶22)). Stadtlander reassured Mosley that her job had not been in jeopardy.  (Doc. 31-1 at 244); Doc. 31-6 (Aff. Stadtlander at ¶23)). Stadtlander "wanted to correct any impression that Ms. Mosley had that she was being forced to resign, as this certainly was not the case."  (Doc. 31-6 (Aff. Stadtlander at ¶23)).

## II.   Motion to Strike

Defendants move to strike portions of Mosley's Declaration (Doc. 38-1 at 1-23) on the basis that certain statements: 1) contradict prior sworn testimony (Paragraphs 26, 35, 46, 47, 52, 64, 75, 79

and 81); 2) constitute conclusory allegations, speculation, and conjecture (Paragraphs 4, 5, 12, 13, 16-18, 22, 38, 45, 51, 52, 65, 66, 69, 75 and 79); and 3) contain irrelevant and/or immaterial statements (Paragraphs 3, 10, 21, 30, 31, 34, and 41).  (Doc. 41 at 1-2).

Rule 56 of the Federal Rules of Civil Procedure provides that motions to strike submitted on summary judgment are not appropriate. Rule 56(c)(2) provides: "[a] party may *object* that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2) (emphasis added). The Advisory Committee Notes specify:

> Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. *There is no need to make a separate motion to strike.* If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Fed.R.Civ.P. 56, *Adv. Comm. Notes*, "Subdivision(c)" (2010 Amendments) (emphasis added).  See, e.g., Campbell v. Shinseki, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("[t]he plain meaning of these provisions show that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily[]"). As such, the Court construes AM/NS' motion to strike as objections to Mosley's Declaration, to be overruled or sustained.

A.      **Contradicting Prior Sworn Testimony (i.e. "sham affidavit or declaration")**

AM/NS objects to **Paragraphs 26, 35, 46, 47, 52, 64, 75, 79** and **81** of Mosley's Declaration, which it asserts contradict her prior sworn testimony -- *i.e.*, asserting the "sham affidavit" rule.  "Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony." McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1240 at n. 7 (11th Cir. 2003). See also Fisher v.

Ciba Spec. Chem. Corp., 238 F.R.D. 273, 284 (S.D. Ala. 2006) (explaining and applying "sham affidavit" rule). Specifically, Rule 56(e) requires that a party opposing a properly supported motion for summary judgment set forth specific facts, admissible as evidence, showing the existence of a genuine issue for trial. The rule specifically allows the court to consider the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits submitted by the opposing party in determining whether a genuine issue exists. However, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984). However, to be stricken as a sham, an affidavit or declaration must be inherently inconsistent. See, e.g., Rollins v. TechSouth, Inc., 833 F.2d 1525 (11th Cir. 1987).

Generally, a comparison of prior sworn deposition testimony with a more recent declaration reveals whether they are clearly or inherently inconsistent. See, e.g., Fisher, 238 F.R.D. at 284. Where there is no obvious inconsistency -- i.e., a declaration does not directly contradict the cited deposition testimony -- the rule is inapplicable. See, e.g., King v. ADT Sec. Servs., 2007 WL 2713212, *3 (S.D. Ala. Sept. 17, 2007); Kerns v. Sealy, 2007 WL 2012867, *10-11 (S.D. Ala. Jul. 6, 2007) (citing Van T. Junkins, 736 F.2d 656). As set forth in King, 2007 WL 2713212 at *3:[15]

> ... the sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case." Allen v. Board of Public Educ. for Bibb County ... 2007 WL 2332506 (11th Cir. Aug. 17, 2007) ... For that reason, and to avoid depriving the trier of fact of the opportunity to discern which witnesses are telling the truth and when, this Circuit "require [s] the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." Id. (citation omitted). For any lesser variation in testimony, the proper approach is to test that inconsistency through cross-examination at trial and allow the jury to weigh it in determining the witness's

---

[15] See also e.g., Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980) (courts must consider all the evidence and cannot disregard an affidavit merely because it conflicts to some degree with an earlier deposition).

credibility. There being nothing more than a possible inconsistency, and certainly much less than an inherent inconsistency ... the sham affidavit rule has no application ...

AM/NS objects to the statements contained in **Paragraphs 26, 35, 46, 47, 52, 64, 75, 79** and **81** of Mosley's Declaration as contradicting her prior sworn deposition testimony.  The Court has reviewed these paragraphs against the cited testimony and is not persuaded:

- Paragraph 26: Mosley's disputes *how* AM/NS wrote their version of the facts, to dispute the inferences it suggests, which does not directly contradict her cited testimony.

- Paragraph 35: Mosley asserts she did not recall receiving the email from Dolbare about audits, which is consistent with her cited testimony that she did not remember receiving the email.

- Paragraph 46: Mosley disputes AM/NS' version of the facts and is consistent with the cited testimony that she cannot speak to when Dolbare reviewed what was sent to her.

- Paragraph 47: Mosley explains that after her deposition, she remembered that Robertson suggested she list her accomplishments but that she did not take any action in response to her complaints -- which is not inconsistent with the cited testimony.

- Paragraph 52: Mosley identified steps Dolbare and Byrd could have taken to process vacation exceptions while absent, which does not contradict her cited testimony that that no one told her about the non-performance of certain tasks while she was absent -- only telling her after she returned that "they didn't have the time" to complete those tasks while she was absent.

- Paragraph 64: there is no contradiction between Mosley's description of what she *believed* was happening -- an intentional increase in her job responsibilities to remove her from her job and to add additional stress to her -- and the cited testimony that no one *told* her they were trying to push her out of her job.  Her statement about her belief is distinct from whether anyone told her this to her.

- Paragraph 75: Mosley states that she believed she had no choice but to resign, which does not contradict the cited testimony that she was not told by anyone that she needed to resign. Her statement about her *belief* is distinct from whether anyone *told* her this.

- Paragraph 79: Mosley described her resignation letter as a cry for help which does not contradict the cited testimony that she felt she was being forced to leave.

- Paragraph 81: Mosley states she believed that Dolbare had asked a co-worker to monitor her, which does not contradict the cited testimony that she believed she was being watched because "I lived it." It is simply her belief.

In sum, the Court cannot discern any inherent inconsistencies, much less any clear and direct contradictions, between the Declaration and Mosley's prior sworn deposition testimony. And the undersigned's comparison of the Declaration and her cited testimony does not even rise to the level of some "lesser variation in testimony" (a matter to be tested at trial and assessed by a jury as to credibility and not on summary judgment). <u>King</u>, 2007 WL 2713212 at *3. Thus, the sham rule has no application and AM/NS' objections to these paragraphs of Mosley's Declaration are **OVERRULED.**

**B.**     <u>**Conclusory allegations, speculation, and conjecture**</u>

AM/NS argues that **Paragraphs 4, 5, 12, 13, 16-18, 22, 38, 45, 51, 52, 65, 66, 69, 75** and **79** of Mosley's Declaration contain conclusory allegations, speculation and/or conjecture.  The objections are **SUSTAINED in part** as follows:

- Paragraph 4: Mosley is asserting her belief about whether AM/NS followed the policies based on her own personal experience.  This is her *belief* - she does not need to offer additional facts.

- Paragraph 5: Mosley asserts AM/NS failed to address her complaints of harassment, retaliation, and discrimination.  There is nothing conclusory about this assertion - she is stating that she made complaints which she believes were not addressed, which are later addressed in the declaration (e.g., Robertson).  The complaints made (if any), to whom, their content, etc., are assessed on summary judgment -- including whether she even made such complaints.

- Paragraph 12: Mosley asserts her belief that there was no team mentality based on her personal experience.  Mosley does not need to identify more.  Her *belief* about in this regard is her own and based on her own personal experience; there is nothing conclusory about this assertion.

- For Paragraph 13, Mosley's statement about whether Stadtlander and/or Dolbare have disabilities is conclusory and speculative.   Thus, the objection to Paragraph 13 is **SUSTAINED**.

- Paragraphs 16-18:  Mosley's statements about the job duties of Mead, Lindsey and George are irrelevant as they do not appear to be based on her personal knowledge but speculation. Said individuals own descriptions of their job duties, as well as AM/NS' description, would be, relevant. Thus, the objection to Paragraph 16 is **SUSTAINED**.

- Paragraph 22: Mosley's statement about her training on SAP can be reviewed against other evidence of record.  As for her statement about the training others received, such appears to be based on speculation versus personal knowledge and thus, that objection is **SUSTAINED.**

- Paragraph 38: Regarding the need to attend meetings, Mosley references her perceived experience regarding one meeting based on her personal knowledge. Such can be assessed on summary judgment.

- Paragraph 45: Mosley's characterization of Dolbare's comment regarding her need to improve is just that, and can be assessed on summary judgment.

- Paragraph 51: Mosley's statement about what Dolbare did and did not do does not appear to be based on her own personal knowledge and thus, the objection to Paragraph 51 is **SUSTAINED.**

- Paragraph 52: Mosley's statement about what Dolbare and Byrd could have done regarding vacation exceptions while she was on leave is speculation and conjecture and thus, the objection to Paragraph 52 is **SUSTAINED.**

- Paragraphs 65-66: Mosley's characterization of the PIP is just that, and can be assessed on summary judgment.

- Paragraph 69: Mosley's statement about witnessing AM/NS' treatment of McMilllan is based on her personal knowledge, not speculation. However, Mosley's assertions as to the reason for such treatment is speculative and thus, the objection is **SUSTAINED** in that regard.

- Paragraph 75: Mosley's statement about it being a certainty that she would be fired is her belief based on her experience at the company, to be assessed on summary judgment.

- Paragraph 79: Mosley's characterization of her letter as a cry for help is her own description of her letter and is not speculative.

## C.   <u>Irrelevant and/or immaterial statements</u>

AM/NS argues that **Paragraphs 3, 10, 21, 30, 31, 34,** and **41** of Mosley's Declaration are irrelevant and/or immaterial. The Court agrees, in part:

- Paragraphs 3 and 10: this information is irrelevant and thus, the objections are **SUSTAINED.**

- Paragraph 21: Mosley's dispute as to how SAP was used is simply that, and can be assessed on summary judgment.

- Paragraphs 30-31: this information may be relevant and will be evaluated on summary judgment.

- Paragraph 34: Mosley's contentions regarding what Byrd communicated may be relevant and will be evaluated on summary judgment.

- Paragraph 41: Mosley's belief and opinion about the GEDP is just that, and can be assessed on summary judgment.

### III.   <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Rule 56(c) provides as follows:

*(c) Procedures*

*(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

*(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

*(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

To succeed, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010).   The party moving for summary

judgment "always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. Id. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 Adv. Cmte. Note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish -- with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. Celotex, 477 U.S. at 324. A genuine dispute exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. Waddell v. Valley Forge Dental Assoc., 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.    Conclusions of Law

Mosley initiated this action against AM/NS alleging ADA disability discrimination, ADA retaliation, ADA interference, and ADEA discrimination.  (Doc. 1).[16]

---

[16] In her Complaint, Mosley alleges ADA and ADEA constructive discharge claims as distinct or separate "claims" under the ADA and ADEA. However, "constructive discharge is actually only an adverse employment action and thus only an element of a claim. E.g., *Rowell v. BellSouth Corp.,* 433 F.3d 794, 806–07 (11th Cir.2005); *Akins v. Fulton County,* 420 F.3d 1293, 1300–01 (11th Cir.2005); *Griffin v. GTE Florida, Inc.,* 182 F.3d 1279, 1283–84 (11th Cir.1999). Consequently, it supports a claim only if the other elements of the claim are satisfied." Burden v. International Longshoremen's Ass'n, Local No.1410, 510 F.Supp.2d 618, 625 (S.D. Ala. Apr. 30, 2007).  Thus, "it is incorrect when ... [a party] characterizes constructive discharge as a distinct claim[]" in a case in which a plaintiff alleges retaliation via adverse employment action in the form of constructive discharge as in that circumstance, it would be a retaliation claim. Aguirre v. City of Miami, 2008 WL 11405966, *3 (S.D. Fla. Mar. 24, 2008).

A.      <u>**ADA**</u>

    1.      <u>**Disability Discrimination**</u>

The ADA protects a qualified individual from discrimination on the basis of disability in the terms, conditions, and privileges of employment, and prohibits an employer from discriminating against a qualified individual with a disability because of the individual's disability. 42 U.S.C. § 12112(a); United States EEOC v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1343 (11th Cir. 2016); Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001). "In order to prevail under the ADA ... [Mosley] must prove all three elements of h[er] *prima facie* case by a preponderance of the evidence.[] "First, [s]he must show that [s]he has a disability. []   Second, [s]he must demonstrate that [s]he is qualified  ... [to perform her job], with or without some reasonable accommodation by ... [AM/NS], despite ... [her] disability. Third, [s]he must show that [s]he has suffered an adverse employment action because of ... [her] disability (*i.e.,* that [s]he has suffered employment discrimination)." Doe v. Dekalb Cty. Sch. Dist., 145 F.3d 1441, 1445 (11th Cir. 1998) (footnotes omitted). See also Thomas v. Cobb Cty. Sch. Dist., 2021 WL 5098767, *1 (11th Cir. Nov. 2, 2021) (a plaintiff must show that she was disabled, qualified, and was subjected to unlawful discrimination *because of her disability*). "Discrimination under the ADA includes the failure to make a reasonable accommodation to a known physical limitation of an individual." Id.

And absent direct evidence of disability discrimination -- but with some exception (*e.g.*, reasonable accommodation cases under the ADA)[17] -- the Court applies the McDonnell Douglas[18]

---

    17 The burden shifting analysis of Title VII is "partially applicable." Everett v. Grady Mem. Hosp. Corp., 2016 WL 9651268, *31 (N.D. Ga. May 12, 2016) (citing *Abram v. Fulton Cty. Govt*., 598 Fed. Appx. 672, 676 (11th Cir. 2015); Nadler v. Harvey, 2007 WL 2404705, *9 (11th Cir. Aug. 24, 2007); Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262 (11th Cir. 2007).

    18 McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

burden shifting framework under which a plaintiff must first establish a *prima facie* case of discrimination. Dulaney v. Miami-Dade Cty., 481 Fed. Appx. 486, 489-490 (11th Cir. 2012); Palmer v. Albertson's LLC, 418 Fed. Appx. 885, 887 (11th Cir. 2011); Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001). If a plaintiff establishes a *prima facie* case, the burden falls to the defendant employer to articulate a legitimate non-discriminatory reason for the challenged employment action -- which "must be clear and reasonably specific[]" -- via the introduction of admissible evidence.[19] Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*). If the defendant satisfies this burden, then the burden shifts back to the plaintiff, who must produce sufficient evidence for a reasonable factfinder to conclude that the reason was not the real reason for the adverse employment action, but was merely pretextual. Id. "To demonstrate pretext, a plaintiff must show that the defendants' proffered reason for the employment decision is false and that discrimination was the real reason." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). A plaintiff cannot satisfy this burden "simply by disputing the wisdom of the reason or by substituting her business judgment for that of the employer's." (Id. (citing Chapman, 229 F.3d at 1030). A plaintiff "must meet the employer's reason head on and rebut it." Id.

---

19 Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-256, 258 (1981) (the employer must articulate legitimate non-discriminatory reasons which "must be clear and reasonably specific" via "the introduction of admissible evidence[]"). "The defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." See generally Thompson v. DeKalb Cty., GA, 2021 WL 5356283 (11th Cir. 2021); Willis v. Koch Agronomic Servs, Inc., 846 Fed. Appx. 787, 797 (11th Cir. 2021); Duckworth v. Pilgrim's Pride Corp., 764 Fed. Appx. 850, 853 (11th Cir. 2019); Chapman, 229 F.3d at 1034-1035; Combs v. Plantation Patterns, 106 F.3d 1519, 1529-1530, 1538 (11th Cir. 1997); Equal Employment Opportunity Comm'n v. Outokumpu Stainless USA, LLC, 205 F.Supp.3d 1287, 1293 (S.D. Ala. Sept. 8, 2016).

Moreover, as summarized in Phillips v. Harbor Venice Mgt, LLC, 2020 WL 2735201, *5

(M.D. Fla. May 26, 2020), addressing ADA constructive discharge:

> To prove a constructive discharge under the ADA, "a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'" Griffin v. GTE Florida, Inc., 182 F.3d 1279, 1283–84 (11th Cir. 1999). In addition, the plaintiff must show that the employer intentionally rendered the employee's working conditions so intolerable based on a protected status, such as disability, that the employee was compelled to quit involuntarily. Henson v. City of Dundee, 682 F.2d 897, 907 (11th Cir. 1982). Moreover, whether the working conditions were sufficiently intolerable to amount to a constructive discharge is judged by an objective standard, not the employee's subjective feelings. Richio v. Miami-Dade Cty., 163 F. Supp. 2d 1352, 1367 (S.D. Fla. 2001).
>
> The standard ... is higher than the standard for proving a hostile work environment. See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001); see also Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316–18 (11th Cir. 1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment, but were not constructively discharged) ...
>
> ... allegations fall short of the threshold needed to show that her working conditions were so intolerable that she had no choice but to resign. See Poole v. Country Club, 129 F.3d 551, 552 (11th Cir. 1997) (holding that constructive discharge claim survived summary judgment where the plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers") ...

See, e.g., Austin v. FL HUD Rosewood LLC, 791 Fed. Appx. 819, 824-825 (11th Cir. 2019) ("[t]he

discriminatory conduct leading up to the employee's involuntary resignation must have been

'pervasive,' with the workplace 'permeated with discriminatory intimidation, ridicule, and insult[]' ...

The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter

the terms or conditions of employment, and this subjective perception must be objectively

reasonable[]...") (internal citations and footnote omitted). As set forth in Menzie v. Ann Taylor Retail,

Inc., 2013 WL 709608, *4 (N.D. Fla. Feb. 27, 2013) (internal citations omitted), "the court does not

consider the plaintiff's subjective feelings about the employer's actions, but only whether a reasonable

person in the plaintiff's position would be compelled to resign[]" and "[g]enerally speaking, 'isolated

incidents (unless extremely serious) will not amount to discriminatory changes in the terms and

conditions of employment[]'" because "[t]he ADA ... is not a general civility code." See also e.g., Richio v. Miami-Dade Cty., 163 F.Supp.2d 1352, 1367-1368 (S.D. Fla. Jun. 4, 2001) (internal citation omitted) ("[t]o prove a constructive discharge under the ADA ... the plaintiff must show that the employer intentionally rendered the employee's working conditions so intolerable based on a protected status, such as disability, that the employee was compelled to quit involuntarily[]").

Mosley alleges her disabilities to be with her left hand due to arthritis and IBS-D issues stemming from gall bladder surgery. (Doc. 37 at 3). For purposes of the following discussion, the Court will assume that Mosley could establish those medical issues as "disabilities."[20] Mosley alleges that because of her disability, AM/NS subjected her to adverse employment actions in the form of heightened scrutiny, inaccurate reporting of her performance, a PIP, and ultimately constructive discharge. (Doc. 37 at 19). As discussed *infra*, Mosley has failed to establish that she was subject to an adverse employment action as the result of her disabilities.

Mosley's claim that she was subject to unlawful ADA discrimination by AM/NS because of her disabilities is rooted primarily in her placement on a PIP, which she alleges resulted in constructive discharge. (Doc. 37 at 20). First, as to her placement on PIP, while Mosley subjectively disagrees with the evaluation of her work performance, she fails to present sufficient evidence from which a reasonable jury could find that she was placed on a PIP because of hand issues or her IBS-D issues. Nor is there any evidence that other similarly situated employees were treated differently. Instead, the record shows a two (2) year history of AM/NS management striving to improve Mosley's work performance, which began before any issues occurred with Mosley's alleged disabilities.

---

[20] AM/NS contests that Mosley was disabled, but does not provide any substantive argument in support.

Moreover, in the Eleventh Circuit issuance of a PIP is not -- standing alone -- an adverse employment action.  Neither is increased scrutiny of work or job performance.  To establish an adverse employment action a plaintiff must show that the action seriously and materially changed the terms, conditions, or privileges of his/her employment.  And while the PIP could have prevented a raise or transfer, it would be speculation for the Court to conclude that Mosley would have been on the PIP long enough to materially affect her terms of employment.

Specific to PIPs, as summarized in Vargas v. Michaels Stores, Inc., 2017 WL 2931379, *13 (M.D. Fla. Jul. 10, 2017) (a race and national origin case):

> ... To be actionable, "[t]he negative evaluation must actually lead to a material change in the terms or conditions of employment, such as 'an evaluation that directly disentitles an employee to a raise of any significance.'" Barnett v. Athens Reg'l Med. Ctr. Inc., 550 Fed.Appx. 711, 713 (11th Cir. 2013)(quoting Gillis v. Ga. Dept. of Corr., 400 F.3d 883, 888 (11th Cir. 2005)[]").
>
> ***
>
> ... the PIP was not an adverse employment action ... Vargas conclusorily states "The unwarranted PIP constitutes an adverse employment action as it led to significant job-related consequences and affected the privileges of his employment." ...Vargas has not shown that any material alteration of his terms and conditions of employment as a result of the PIP actually occurred. The Court could only conclude that the PIP was an adverse employment action if it speculated that Vargas would have failed the first interval of the PIP and thus been ineligible to receive a bonus when bonus eligibility would have been determined. But "inferences based on speculation and conjecture are not reasonable." Barnett, 550 Fed.Appx. at 713–14 ("Thus, based on the above, the inference could not be drawn that an unsatisfactory score on [Barnett's] evaluation would preclude a merit increase.") ...

See also e.g., Barnett v. Athens Reg. Med. Ctr. Inc., 550 Fed. Appx. 711, 714 (11th Cir. 2013) (granting summary judgment on an age discrimination claim, in part because reprimands and negative performance reviews did not constitute an adverse employment action); Apodaca v. Secretary Dept. of Homeland Sec., 161 Fed. Appx. 897, 900-901 (11th Cir. 2006) (for a race and national origin discrimination claim and a retaliation claim, a plaintiff failed to show he suffered an adverse employment action because the unsatisfactory annual performance evaluation and additional

performance evaluations containing unsatisfactory comments did not materially alter the terms and conditions of his employment); Embry v. Callahan Eye Fdtn. Hosp., 147 Fed. Appx. 819, 823, 828-829 (11th Cir. 2005) (for a disparate treatment discrimination claim (race and retaliation), a written reprimand which did not result in any loss of pay or benefits did not constitute an adverse employment action); Vargas v. Michaels Stores, Inc., 2017 WL 3723655 (M.D. Fla. Aug. 29, 2017) (discussing race and national origin discrimination claims and referencing the court's prior summary judgment ruling holding that placement on PIP was not an adverse employment action because there was no showing of any material alteration in the terms and conditions of employment as a result of the PIP); Carroll v. Ceridian Benefits Servs., 2012 WL 5431007, *8 (M.D. Fla. Nov. 7, 2012) (placement on a PIP is not an adverse employment action in a race discrimination case); Bowen v. Quest Diagnostics Inc., 2021 WL 2583495, *6-7 (S.D. Fla. Jun. 2, 2021) (for a race discrimination claim, after receiving PIPs, written reprimands and negative performance reviews, it was still "questionable whether Plaintiff suffered an adverse employment action[]" and because the PIPs (and other items) did not alter the plaintiff's salary or employment terms, "there is no genuine issue of material fact with respect to whether Plaintiff suffered an adverse employment action[]"); Smith v. CA, Inc., 2008 WL 5427776, *7 (M.D. Fla. Dec. 30, 2008) (in a race discrimination case, a plaintiff's placement onto a PIP was not an adverse employment action because it merely required plaintiff to improve his performance to comply with previously established expectations, and did not seriously or materially alter the terms, conditions or privileges of his employment (did not result in a change to his compensation or position)).

Also, Mosley has failed to establish that she was constructively discharged.  Being placed on a PIP is not grounds for a constructive discharge claim.  Harper v. ULTA Salon Cosmetics & Fragrance, Inc., 2007 WL 528088 at note 34 (N.D. Ga. Feb. 13, 2007) (a plaintiff "could  not establish a constructive discharge claim merely because she was placed on a PIP[]") (internal citation omitted));

Willoughby v. Bellsouth Billing, Inc., 2007 WL 9711460, *8 (N.D. Ala. Sept. 19, 2007) ("[t]he fact that Willoughby might have been fired had she chosen to remain .... on the PIP program "is not sufficient to establish the intolerable conditions sufficient to justify a finding of constructive discharge because the possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired[]'") (internal citations omitted).[21]    Mosley's constructive discharge claim is rooted in her assumption that she would fail the PIP and be terminated as a result (*i.e.*, that she was set up to fail by being placed on PIP).   The record contains no evidence AM/NS had the intention of terminating her at the time the PIP issued.   And notably, Mosley did not even participate in the PIP, choosing instead, the very next business day, to submit her resignation.

Further, "[t]he Eleventh Circuit has recognized that 'resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause ...' Rodriguez v. City of Doral, 863 F.3d 1343 (11th Cir. 2017). See also Jones v. Allstate Ins. Co., 707 Fed. Appx. 641, 646 (11th Cir. 2017) ("Plaintiff's decision to voluntarily resign in the face of a possible termination is not a constructive discharge," and thus, Plaintiff failed to establish an adverse employment action). As explained in Gonzalez v. PNC Bank, N.A., 2018 WL 4924341, *6 (M.D. Fla. Oct. 10, 2018):

> A genuine voluntary resignation cannot support a constructive discharge claim. "A resignation is voluntary as long as the plaintiff had a choice, even if the alternatives are unpleasant." Jones v. Allstate Ins. Co., 707 F. App'x 641, 646 (11th Cir. 2017) (per curiam) (citing Hargray v. City of Hallandale, 57 F.3d 1560, 1568 (11th Cir. 1995)

---

[21] As summarized in Willoughby v. Bellsouth Billing, Inc., 2007 WL 9711460, *8 (N.D. Ala. Sept. 19, 2007) ("...Willoughby argues that she was forced to retire because the only alternative was being placed on a sixty-day PIP, during which she could be terminated for making one mistake. To show constructive discharge, Willoughby must show that the situation at Bellsouth was "so 'intolerable' that [she] had 'no choice' but to take early retirement." Rowell v. Bellsouth Corp., 433 F.3d 794, 806 (11th Cir. 2005) ... See also Saville v. IBM, 188 Fed. Appx. 667, 670 (10th Cir. 2006) (noting that being placed on a PIP under which one complaint could result in termination does not constitute an "adverse employment action")*and Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) ("[W]e have held that criticism in performance reviews and institution of performance improvement plans, alone, do not constitute objectively intolerable conditions."). ... Willoughby has not established that she had "no objectively reasonable opportunity to remain employed" at Bellsouth. As such, no reasonable jury could find that Willoughby was constructively discharged ... [and] Willoughby cannot prove a *prima facie* case of disability discrimination...").

(stating that where plaintiff has a choice, she can "stand pat and fight") ). Learning of an employer's intent to fire a plaintiff, accompanied by a reprimand and an offer to transfer offices, are insufficient to support a constructive discharge claim. See Fitz, 348 F.3d at 977–78. Furthermore, repeatedly receiving negative performance evaluations "does not rise to the level of such intolerable conditions that no reasonable person would remain on the job." Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001).

***

... Although Plaintiff paints a picture of an unpleasant work environment, she has not "produce[d] substantial evidence that conditions were intolerable." Akins, 420 F.3d at 1302 (emphasis added); Fitz, 348 F.3d at 977; cf. Poole, 129 F.3d at 552 (holding that constructive discharge claim survived summary judgment where the plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"); Meeks v. Comp. Assocs. Int'l, 15 F.3d 1013, 1014–15, 1021–22 (11th Cir. 1994) (finding that evidence showing the plaintiff was placed on probation, received unjustified performance evaluations, and was berated with such ferocity that the supervisor's "spit was flying in [the plaintiff's] face," supported a constructive discharge claim).

Moreover, Plaintiff's argument that she was given unmeetable performance goals in a bid by San Giovanni to ensure her termination down the road is too speculative to support a constructive discharge claim. See Rowell v. BellSouth Corp., 433 F.3d 794, 806 (11th Cir. 2005) ("[T]he possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.' "). Plaintiff could have stayed, which indeed may have been an "unpleasant" choice, but she chose to voluntarily resign. See Jones, 707 F. App'x at 646. Accordingly, Plaintiff's constructive discharge claim fails ...

Finally, unless an employer is given sufficient time to remedy the situation, a constructive discharge will generally not be found to have occurred. Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1245 at note 81 (11th Cir. 2001) (citing Coates v. Sundor Brands, 164 F.3d 1361, 1364-1365 (11th Cir.1999) and Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir.1996)).

See also e.g., Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974 (11th Cir. 2003) ("[m]ere suspicion of an unsubstantiated plot is not an intolerable employment condition[]"); Sheppard v. International Business Machines Corp. 2021 WL 2649455, *6 (N.D. Ga. May 27, 2021) (Report & Recommendation) ("[a] plaintiff cannot rely on 'suspicion of an unsubstantiated plot'" to establish constructive discharge "because holding otherwise 'would encourage speculative litigation and

38

discourage employees and employers from resolving their differences from within the employment relationship[]"); Wingfield v. South Univ. of Fla., Inc., 2010 WL 2465189, *10 (M.D. Fla. Jun. 15, 2010) (footnote omitted) ("in disability discrimination claims ... the law 'does not create a cause of action for constructive discharge where the employee assumes the worst and resigns before giving management a chance to rectify the situation.' [ ] Unless the employer gets sufficient time to remedy the intolerable working conditions, 'a constructive discharge generally will not be found to have occurred.' [ ] In this case, Wingfield assumed the worst[]"); Schwertfager v. City of Boynton Beach, 42 F.Supp.2d 1347, 1368 (S.D. Fla. 1999) (finding that because the plaintiff did not give her employer sufficient time to remedy the situation by bringing her complaints to its attention and so she had not shown constructive discharge).

Thus, summary judgment is **GRANTED** on Mosley's ADA disability discrimination claim (Count 1).

### 2.    Retaliation

As summarized in Bosarge v. Mobile Area Water & Sewer Service, 2022 WL 203020, *11 (11th Cir. Jan. 24, 2022):

> The ADA prohibits retaliation against an individual "because such individual has opposed any act or practice made unlawful [by the Act] or ... made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. 42 U.S.C. § 12203(a). When an ADA retaliation claim is based on circumstantial evidence, as Plaintiff's claim is, we analyze the claim under the *McDonnell Douglas* burden-shifting framework. *See Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018). Plaintiff must first establish a prima facie case of retaliation by showing that: (1) he engaged in a statutorily protected expression, (2) he suffered an adverse action, and (3) there was a causal link between the two. *See id.* at 1329. The burden then shifts to Defendants to articulate a legitimate, non-retaliatory reason for their actions. *See id. ...*

See also Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016) (setting forth the elements).

Mosley alleges that she engaged in statutorily protected expression when she sought accommodations for her physical impairments, including work restriction for her left hand, time off from work for surgeries and medical treatments, and moving her workstation closer to the restroom. "The first element may be met when an employee alleges that she has 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' the ADA. 42 U.S.C. § 12203(a). It may also be met when an employee states that she made a request for a reasonable accommodation, as long as she had a good faith, objectively reasonable belief that she was entitled to those accommodations ...." Seay v. Eagle Cleaning Service, 2019 WL 1897175, *3 (N.D. Ala. Apr. 29, 2019) (citation omitted). See also Thatcher v. Department of Veterans Affairs, 2021 WL 4940824, *3 (11th Cir. Oct. 22, 2021) (recognizing that a request for a reasonable accommodation is a protected activity); Hughes v. Wal-Mart Stores East, LP, 846 Fed. Appx. 854, 858 (11th Cir. 2021); ("[a]n employee participates in a protected activity when she makes 'a request for a reasonable accommodation.' *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016)[]"); Monroe v. Florida Dep't of Corr., 793 Fed. Appx. 924, 928 (11th Cir. 2019) (*per curiam*) (citation omitted) ("[t]he employee must have had a good faith, reasonable belief ... the activity was protected by the statute[]").

Assessing the reasonableness of Mosley's belief depends on whether she has submitted sufficient evidence showing, that at the time she requested the accommodation, *her belief* that she was disabled was objectively reasonable. See, e.g., Castleberry v. Camden County, 2018 WL 4702163, *13 (S.D. Ga. Sept. 30, 2018) (finding a plaintiff's reasonable accommodation request established statutorily protected activity because the evidence supported his belief that he was disabled and qualified for reasonable accommodations); Hein v. IMS Gear Holding, Inc., 2018 WL 1833254, *24 (N.D. Ga. Jan. 31, 2018) (finding a plaintiff had at least created an issue of fact as to whether he engaged in a protected activity by putting the defendant on notice that he required medical treatment

40

for a disability, communicated his need for leave, and requested accommodations per doctor's orders in order to work).

The Court will assume that Mosley could establish the first element. However, Mosley cannot establish, as a matter of law, that she suffered an adverse employment action. According to Mosley, her placement on PIP was *the* adverse employment action. As detailed *supra*, Mosley's placement on a PIP, based on the evidence before the Court, was not an adverse employment action. Thus, summary judgment is **GRANTED** on Mosley's ADA retaliation claim (Count II).

**B.**   **ADEA Discrimination**

Mosley alleges ADEA discrimination as follows:

- She was over the age of 40 at the time of the discrimination.
- She was the oldest person working on her team in 2017 and 2018.
- AM/NS criticized her more harshly than younger persons on her team for making similar and/or identical mistakes.
- AM/NS provided training on its new system to Mead, the youngest member of the team who was more than 20 years her junior, but did not provide this to her.
- The disparity in training provided signaled to her that AM/NS was investing in Mead's future but not her future, and appeared to be an effort to set her up to fail and/or not be as successful with the new system.
- AM/NS subjected her to heightened scrutiny and inaccurate documentation relating to her performance, including a PIP, because of her age.
- Substantially younger employees made numerous errors and exhibited performance that was less satisfactory than her, but the younger employees' deficiencies were not documented, nor were they put on a PIP.
- AM/NS used PIPs as tools terminate older employees.
- AM/NS' efforts to fire her culminated in constructive discharge 6/25/18.
- AM/NS replaced her with someone substantially younger, Ms. George, by assigning her Mosley's job duties.
- AM/NS brought Ms. George into her department in April 2018, two months prior to her constructive discharge.
- The timing of Ms. George's arrival in her department combined with heightened scrutiny and criticism of at that time suggested that she was brought into the department to replace Mosley.
- AM/NS discriminated against her because of her age.
- AM/NS' discriminatory conduct injured her.

(Doc. 1 at 26-27).

The ADEA prohibits employers from discriminating against an employee who is at least 40 years old "with respect to [her] compensation, terms, conditions, or privileges of employment, because of" that employee's age. 29 U.S.C. §§ 623(a)(1), 631(a).  As summarized in Austin v. FL HUD Rosewood LLC, 791 Fed. Appx. 819, 824-825 (11th Cir. 2019) (footnote omitted):

> ... the ... four prima facie elements: ... member of the protected age group ...; .... qualified for her ... position; ... replaced in that position by a substantially younger person ... [and] ... suffered an adverse employment action ... meaning ... "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." See Brown v. Snow, 440 F.3d 1259, 1265 (11th Cir. 2006) (quotation marks omitted) ...

> ... Although it was not ...[the plaintiff's] ... burden to prove there was no disputed issue of material fact on this ground, it was her burden, as the plaintiff, to establish a prima facie case of discrimination. See Sims v. MVM, Inc., 704 F.3d 1327, 1332–33 (11th Cir. 2013); cf. Howington v. Quality Rest. Concepts, LLC, 298 F. App'x 436, 442 (6th Cir. 2008) (unpublished) (holding an adverse action exists where plaintiff, a bartender whose salary depended in part on tips, "undoubtedly" lost compensation when she was sent home early); Franklin, 600 F. Supp. 2d at 58, 72 (adverse action exists where plaintiff was sent home and placed on "leave without pay status"). In order to survive summary judgment, she had to present evidence that there was a triable issue of fact on this ground. See Sims, 704 F.3d at 1333 ...

> \*\*\*

> An increased workload gives rise to an ADEA claim only if the change is "so substantial and material that it does indeed alter the terms, conditions, or privileges of employment." Davis v. Town of Lake Park, 245 F.3d 1232, 1245 (11th Cir. 2001) (quotation marks omitted), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53... (2006). ... See Wardwell v. Sch. Bd. of Palm Beach Cty., 786 F.2d 1554, 1557–58 (11th Cir. 1986) (per curiam) (denying constructive discharge claim where employee was "overburdened" with additional work but her working hours remained the same).

Additionally, the threshold for constructive discharge "is quite high." Hipp, 252 F.3d at 1231. To survive summary judgment, "the plaintiff must produce substantial evidence that conditions were intolerable." Akins v. Fulton Cty. Ga., 420 F.3d 1293, 1302 (11th Cir. 2005).  Moreover, as noted supra, a voluntary resignation cannot support a constructive discharge claim. Jones, 707 Fed. Appx. at 646; Gonzalez,, 2018 WL 4924341 at *6.

In the Eleventh Circuit, courts use the <u>McDonnell Douglas</u> framework to evaluate ADEA claims based on circumstantial evidence of discrimination.  <u>Robinson v. Walmart Stores East, LP</u>, 2021 WL 5881756, *3 (11th Cir. 2021) (citing <u>Chapman</u>, 229 F.3d at 1024 (finding that the plaintiff offered no evidence that her age was the "but for" cause of her termination and thus, summary judgment was properly granted in favor of her employer)).  But, "[u]ltimately, however, to prevail on an ADEA age discrimination claim, an employee must show that her age was the 'but-for' cause of the adverse employment action." (<u>Id</u>. (citing <u>Gross v. FBL Fin. Servs., Inc</u>., 557 U.S. 167, 177 (2009)).

The Court turns first to Mosley's *prima facie* case.  The parties do not dispute that Mosley is a member of the protected class of individuals over 40 years old.  And while AM/NS disputes that Mosley was qualified, such is irrelevant because there is insufficient evidence that Mosley suffered an adverse employment action.  Mosley also fails to show that any similarly situated employee was treated differently.  <u>See</u> *supra*.  As such, Mosley has failed to establish her *prima facie* case.  Thus, summary judgment is **GRANTED** on Mosley's ADEA discrimination claim (Count IV).

## C.      <u>Interference with ADA rights</u>

Mosley also alleges that AM/NS interfered with the exercise or enjoyment of her protected rights, as secured to her under the ADA (Count III).  (Doc. 1 at 24-26).  42 U.S.C. § 12203(b).  Mosley alleges she engaged in protected activity by requesting numerous accommodations under the ADA, including FMLA leave, "using a splint for her hand, no lifting, light duty, reduced workload and/or patience since it takes her longer to complete tasks due to her splint, and moving to a cubicle closer to a restroom."  (Doc. 37 at 18).  Mosley further alleges that because of her requests for these accommodations, Dolbare subjected "her to heightened scrutiny, unreasonable expectations, and a PIP." (<u>Id</u>.)  Mosley characterizes these acts as coercive, threatening, intimidating and/or interfering.

The Eleventh Circuit has declined to determine the appropriate standard for ADA interference claims, recognizing it "ha[s] not yet had occasion to explain the proper standard[.]"  Atchison v. Board of Regents of Univ. Sys. of Georgia, 802 Fed. Appx. 495, 509 (11th Cir. 2020) ("[w]e begin by noting that we have not yet had occasion to explain the proper standard for evaluating an ADA anti-interference claim[] however, "[w]e need not determine the proper standard, because Atchison's claims fail under any potentially feasible standard[]" as "both of his remaining claims fail as a matter of law for lack of any factual support[]").  However, according to the EEOC, the interference claim is broader than a retaliation claim, and does not require a materially adverse employment action.  EEOC Enforcement Guidance On Retaliation and Related Issues, 2016 WL 4688886, *26 (E.E.O.C. Guidance Aug. 25, 2016) ("[b]ecause the []'interference' provision is broader, however, it will reach even those instances when conduct does not meet the 'materially adverse' standard required for retaliation[]").  But even so, "the interference provision does not apply to any and all conduct or statements that an individual finds intimidating. [ ] In the Commission's view, it only prohibits conduct that is reasonably likely to interfere with the exercise or enjoyment of ADA rights." Id. at *27 (footnotes omitted).  And as Mosley points out, the actions that interfere must have been motivated by an intent to discriminate.

Mosley contends that this claim is still viable because AM/NS failed to move for summary judgment on the claim.  AM/NS responds that "the same evidence that demonstrates that Plaintiff was not subjected to disability discrimination establishes that there was no so-called interference with her rights under the ADAAA." (Doc. 40 at 1).  In other words, it appears that AM/NS contends that Mosley is unable to establish that any of the actions taken against her, which she alleges intimated her or interfered with her ADA rights, were motivated because she requested accommodations.

The Court finds that further briefing and argument are required to resolve this issue. **Accordingly, it is ORDERED that the parties shall each file a brief, on or before March 14, 2022**, which addresses the following: 1) what constitutes interference and/or intimidation under the anti-interference provision of the ADA; 2) clarification by Mosley of when and what specific accommodations were requested and how long the accommodations were needed; 3) a clear timeline between when specific accommodations were requested and when the alleged intimidating/interfering actions occurred; 4) whether a request for a reduced workload is a request for a reasonable accommodation and thus protected activity; and 5) whether a temporal relationship between the alleged intimidating/interfering actions and the request for accommodations is sufficient to establish an issue of material fact regarding motivation for the actions.

## IV.  <u>Conclusion</u>

Accordingly, it is **ORDERED** that the Defendant's Motion to Strike (Doc. 41) is **OVERRULED in part** and **SUSTAINED in part** as detailed *supra*; and that the Defendant's summary judgment (Docs. 29-32) is 1) **GRANTED** as to Mosley's ADA disability discrimination claim, 2) **GRANTED** as to Mosley's ADA retaliation claim, and 3) **GRANTED** on Mosley's ADEA discrimination claim.  Mosley's ADA interference claim is carried to the Pre-Trial Conference.

**DONE** and **ORDERED** this the **7th** day of **March 2022.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**