IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DONNA M. MOSLEY,          )
    Plaintiff,             )
                           )
v.                        )          CIVIL ACTION: 1:20-00517-KD-M
                           )
AM/NS CALVERT, LLC,       )
    Defendant.             )

ORDER

This matter is before the Court on Plaintiff's ADA interference claim raised in her Response to summary judgment (Docs. 37, 38), Defendant's Reply (Doc. 40); Plaintiff's ADA interference brief (Doc. 48); and Defendant's ADA interference brief and Supplement (Docs. 49, 50, 52, 53).[1]

I.  **Findings of Fact**[2]

A.  **Work History & Performance**

Plaintiff Donna M. Mosley (Mosley) formerly worked for Defendant AM/NS Calvert, LLC, as a "Rep II HRIS." (Doc. 38-3 (Dep. Dolbare at 103)).  In this position, while under the supervision of Director of Human Resources and Communication Joel Stadtlander (Stadtlander), Mosley was responsible for leading the HR data function, timely and accurately reporting data, maintaining organization structure, working as the Nimbus "author," and preparing standard HR reports.  (Doc. 31-

---

1 Altogether construed as a motion for summary judgment on Mosley's ADA interference claim.

2 The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH– Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000). Additionally, the findings of fact in this case have already been detailed in the Order granting summary judgment, and the Court will not restate them here. (Doc. 46).  Rather, the Court's focus is limited to facts relevant to Plaintiff's ADA interference claim, including any additional facts and/or evidence submitted in response to Doc. 46, but in so doing still relies on the findings of facts in Doc. 46.

1 (Dep. Mosley at 107-108); Doc. 31-3 (Aff. Dolbare at ¶6); Doc. 31-7 (Dep. Dolbare at 21-22); Doc. 31-6 (Aff. Stadtlander at ¶2)).  Mosley's duties included heavy data entry into SAP (*e.g.*, processing of employee records relating to new hires, terminations, organizational reassignments, job changes, salary changes, and address changes.  (Id.)  Mosley responded to requests from internal sources for various reports and information; created and maintained positions and organizational charts; created and maintained the HR Nimbus process and associated documents; and submitted SAP changes to ensure data integrity for "Helpdesk" and "Active Directory."  (Doc. 1 at 5).  Mosley used Excel to prepare "bar reports" formulated with information supplied by her supervisors.  (Doc. 31-1 (Dep. Mosley at 110-112)).  Mosley also received training in auditing and on SAP, OrgPublisher, Excel, and had access to online training courses.  (Doc. 31-1 (Dep. Mosley at 55-56, 92, 130-131, 137-140, 170-171); Doc. 31-3 (Aff. Dolbare at ¶¶10, 11); Doc. 31-7 (Dep. Dolbare at 24-25)). As part of her duties, Mosley understood the importance of being flexible, being accurate with data, the need to audit her work for accuracy to correct mistakes, and more.  (Doc. 31-1 (Dep. Mosley at 109-110, 112, 118-119); Doc. 31-2 (Aff. Byrd at ¶5); Doc. 31-3 (Aff. Dolbare at ¶¶8, 10); Doc. 31-7 (Dep. Dolbare at 24-25)).

In September 2016, Mosley began reporting to Brooke Dolbare (Dolbare), the newly named Team Manager.  (Doc. 31-1 (Dep. Mosley at 88-89; Doc. 31-3 (Aff. Dolbare at ¶3, 6); Doc. 31-6 (Aff. Stadtlander at ¶¶2, 10)).  From September 2016 to June 2018, Dolbare supervised Mosley and others. (Doc. 31-1 (Dep. Mosley at 94, 100-102, 104); Doc. 31-3 (Aff. Dolbare at ¶6); Doc. Doc. 31-5 (Aff. Mead at ¶4); 31-7 (Dep. Dolbare at 45-47)).  While supervising Mosley over the next two years, Dolbare observed "a number of deficiencies" in her job performance: "trouble getting the work actually accomplished[;]" failing at times to provide accurate data and/or numbers; often failing to audit her work (even though she specifically counseled Mosley to do so); difficulty prioritizing her work (she was often overwhelmed with work tasks because she would not use her time efficiently and would

waste time on unnecessary tasks); choosing not to engage with the rest of the team (turning down trainings, removing herself from OrgPublisher on which the rest of team was working, declining to participate in team activities, etc.); and unsuccessfully communicating with others to provide information requested.  (Doc. 31-1 (Dep. Mosley at 88-89); Doc. 31-2 (Aff. Byrd at ¶10); Doc. 31-3 (Aff. Dolbare at ¶¶8-10, 12 and Att. 2 thereto); Doc. 31-7 (Dep. Dolbare at 32-39)).

 Dolbare avers that she made multiple efforts to assist Mosley improve her job performance but was unsuccessful.  (Doc. 31-3 (Aff. Dolbare at ¶11)).  Dolbare also avers that she did not assign Mosley more job tasks than others on the team, but instead, "there were times when I removed duties at Ms. Mosley's request."  (Id. (Aff. Dolbare at ¶9)).  Mosley has not rebutted these assertions except with conclusory statements that she was set up by Dolbare to fail and that the workload was unreasonable.

Additionally, according to Stadtlander, while supervising Mosley, he had various discussions with her about her job duties and responsibilities, and "it was my observation ... that she was given more one-on-one assistance and attention than others on the team."  (Doc. 31-6 (Aff. Stadtlander at ¶15)). Stadtlander noted Mosley struggled at times to accomplish or finish tasks, failed to provide accurate information on a regular basis, had difficulty prioritizing tasks (focusing on irrelevant topics rather than her job), and had certain performance deficiencies.  (Id. (Aff. Stadtlander at ¶¶16-20 (and Att. 4 thereto))).

Another team member, Karen Byrd (Byrd), worked as Team Manager of Governance in 2018 and currently is the Manager of SAP Project Services.  (Doc. 31-2 (Aff. Byrd at ¶2)).  Byrd provided technology support for HR related to SAP, and so worked closely with individuals in the Compensation, Benefits, and HRIS Team, which included Mosley.  (Id. (Aff. Byrd at ¶¶5-6)).  As for Mosley's job performance, Byrd observed that she failed to demonstrate attention to detail in her work,

and that if given specific steps to a process could follow those steps but if asked to do so again, without guidance she would struggle to remember what she needed to do (*e.g.*, VLookup on Excel).  (Id. (Aff. Byrd at ¶10).  Per Byrd, Mosley often asked her for assistance, but also would reference her workload as the reason she could not perform another task.  (Id. (Aff. Byrd at ¶11)).  Mosley, at times, failed to do her own legwork or research before asking Byrd for assistance.  (Id. (Aff. Byrd at ¶12)).  Byrd observed numerous errors by Mosley.  (Id. (Aff. Byrd at ¶13)).  Mosley struggled with managing her workload, but the overall expectations for her were reasonable and were no greater than those for other team members.  (Doc. 31-2 (Aff. Byrd at ¶14)).  Byrd summarizes: "It was evident to me, from my interactions with Ms. Mosley, that she needed one-on-one attention in order to be able to successfully fulfill her job duties as an HRIS Specialist."  (Id. (Aff. Byrd at ¶14)).

In March 2017, Mosley received a 2016 GEDP (performance evaluation for her work in 2016) completed by Stadtlander which found that she met or exceeded expectations.  (Doc. 31-1 at 183-189); Doc. 31-1 (Dep. Mosley at 113-116); Doc. 31-6 (Aff. Stadtlander at ¶11 and Att. 4)).  However, Stadtlander rated Mosley having "Basic" competencies and "to continue to make the technical pieces easier to understand for the nontechnical people. Convey information and not data when appropriate. Also be sure to fully understand what the receiver/requester is asking."  (Doc. 31-1 (Dep. Mosley at 113-116); Doc. 31-6 (Aff. Stadtlander at ¶18).

On July 20, 2017, Dolbare found more than 12 issues with reporting that Mosley should have audited as part of her role.  (Doc. 31-3 at 36).  From August 2017 to February 2018, Dolbare communicated with other management at AM/NS about Mosley's continuing work performance issues. (Doc. 31-7 (Dep. Dolbare at 35, 191-207); (Doc. 31-4 (Aff. Motes at ¶10); Doc. 31-4 (Aff. Motes at ¶9)).  In March 2018, Dolbare issued Mosley a 2017 GEDP (assessing her 2017 work performance) identifying areas of gaps and deficiencies (effectiveness, efficiency, consistency, auditing, using

4

programs that would expedite her work, needing to improve communicating as well as listening and interpreting request cautiously and with intent of directly answering the question with appropriate data, etc.)  (Doc. 31-1 at 208-219).  See also (Doc. 31-1 (Dep. Mosley at 166-169); Doc. 31-3 (Aff. Dolbare at ¶12-13); Doc. 31-7 (Dep. Dolbare at 105-108)).  Mosley struggled to maintain her workload.  (Doc. 31-1 at 215).  The review concluded that: "The expectation is an improvement in performance, Accuracy, speed of work, ability to participate in project work as needed are expected of the HRIS role."  (Id.)  Mosley was provided with the opportunity to respond and she stated she had been micromanaged and disrespected by Dolbare.  (Doc. 31-1 at 215-216).

In reply on April 3, 2018, Dolbare told Mosley that if there was no improvement in accuracy and efficiently in her work performance "in the following weeks" a formal performance improvement plan (PIP) "would follow."  (Id. at 216-219).  Per Dolbare, thereafter, Mosley's "performance failed to improve in any significant way ... I determined that she needed to be placed on a ...PIP[.]"  (Doc. 31-3 (Aff. Dolbare at ¶19); Doc. 38-3 (Dep. Dolbare at 79); Doc. 31-7 (Dep. Dolbare at 32-35, 37, 39)).  On June 14, 2018, Dolbare emailed Robertson, Motes, and Stadtlander a draft PIP, and discussed issuing a PIP for Mosley, stating "unfortunately, it is time to address not only performance but behavior concerns."  (Doc. 31-3 at 85-86; Doc. 31-6 (Aff. Stadtlander at ¶21); (Doc. 31-4 (Aff. Motes at ¶¶13; Doc. 31-3 (Aff. Dolbare at ¶21)).  Motes and Stadtlander agreed with Dolbare's decision to place Mosley on a PIP. (Doc. 31-3 at 85; Doc. 31-4 (Aff. Motes at ¶13); Doc. 31-6 (Aff. Stadtlander at ¶21)).

In June 2018, Mosley received a mid-year GEDP review (for a portion of her 2018 work performance) which found as follows:

- for promoting health and safety, she was on track; and
- for supporting performance driven cultures, she was behind/at risk,

(Doc. 31-1 at 222-225; Doc. 31-3 (Aff. Dolbare at ¶15). Mosley presumed that the 2018 mid-year review had been drafted by Dolbare, in response to which she submitted comments after first sending

them to TMR Robertson on June 17th.  (Doc. 31-1 (Dep. Mosley at 173-178, 211-220); Doc. 31-3 (Aff. Dolbare at ¶15); Doc. 31-4 (Aff. Motes at ¶¶11-12); Doc. 31-7 (Dep. Dolbare at 136-137, 138-150); Doc. 31-6 (Aff. Stadtlander at 20)).  Mosley "specifically wanted to meet with Queen [Robertson] about what I thought was retaliation and bullying or harassment issues."  (Doc. 31-1 (Dep. Mosley at 179)).  Mosley emailed TMR Robertson, requesting to speak with her about these complaints and scheduled a June 18, 2018 meeting.  (Id. (Dep. Mosley at 179, 213, 218); Doc. 31-1 at 221). Subsequently, Mosley submitted comments in response to the review and sent a copy to Robertson (Doc. 31-1 at 223-224; Doc. 31-1 (Dep. Mosley at 218)).  Mosley stated that her supervisor did not understand how long tasks require and that she did not have time to complete the assigned tasks.  (Id.) Mosley concluded that her supervisor was setting her up to fail.  (Id.)

On June 22, 2018, Dolbare, with Robertson present, met with Mosley and presented her with the Performance Improvement Plan (PIP), to last 90 days with "check ins" every 30 days.   The PIP noted Mosley's inaccuracies with tasks, inability to work in Excel and do so efficiently, inability to maintain Nimbus, behavior that shows discontent with the team, failure to participate in team events/lunch, inability to be on time for meetings/calls, and historic reluctance to perform mass data entries -- instead preferring to manually enter in all the data.  (Doc. 31-1 at 233). At the meeting neither Dolbare nor Robertson told Mosley she would be terminated, and Mosley does not recall anyone saying anything about her medical condition, medical leave, and/or age.  (Doc. 31-1 (Dep. Mosley at 223-224, 235-236); Doc. 31-3 (Aff. Dolbare at ¶¶19-22, 25); Doc. 31-4 (Aff. Motes at ¶17); Doc. 31-7 (Dep. Dolbare at 78-80)).  Dolbare avers "I had no plans to terminate her employment or to recommend termination of her employment when I issued her the PIP."  (Doc. 31-3 (Aff. Dolbare at ¶22)).

In response, Mosley was not happy with the PIP, did not agree with the content, and did not believe it was deserved.  (Doc. 31-7 (Dep. Dolbare at 157); Doc. 31-1 (Dep. Mosley at 234); Doc. 1 at

16).  Mosley asserts that the PIP misrepresented several aspects of her job performance, included many duties which were not normally required of her, and did not include clear benchmarks or objective criteria for evaluation.  (Doc. 1 at 15, 17).  For instance, the PIP directed her to "find ways to be productive," demanded busy-work that would detract from her productivity (*e.g.*, requiring her to make lists of tasks completed), contained unreasonable expectations that could not be met in the timeframe provided, demanded impossible requirements due to the nature of work (no errors for certain tasks), contained subjective criteria that could not be objectively assessed and would allow Dolbare to manipulate the results, and was the equivalent of "do better" without any clear direction or how to accomplish such.  (Doc. 31-3 (Dep. Mosley at 200, 231, 233-234)).  As to the specific measurables for Mosley to accomplish in the timeframe given, "I believe that my supervisor lacks complete understanding and knowledge of the time it takes to complete assigned tasks[]" and "she doesn't understand the time constraints that I have .... duties were more than one full-time position." (Doc. 31-1 (Dep. Mosley at 231, 234)).  In Mosley's mind, the PIP was an effort to create a paper trial to fire her, a tool to make working conditions so intolerable that she would quit, and a tool to manage her out of her job due to her age, health, and related requests for accommodations and/or complaints.  (Doc. 1 at 18).  Mosley asserts "[i]t was not reasonable to create/issue a ... [PIP]...during my ongoing recovery of two major surgeries within a 6-month period[]" as "it was obvious I was limited in my ability to use my a hand and/or work at full capacity[.]"  (Doc. 38-1 (Decltn. Mosley at ¶¶67-68)).

On June 25, 2018, Mosley submitted her "immediate, involuntary resignation, under duress, due to the undue stress and hardship that the Personal Improvement Plan (PIP) would place upon me, physically, with respect to my ongoing recovery from the effects of my recent cholecystectomy." (Doc. 31-1 at 234; Doc. 31-1 (Dep. Mosley at 237-240; Doc. 31-3 (Aff. Dolbare at ¶22); Doc. 31-4 (Aff. Motes at ¶15): Doc. 31-6 (Aff. Stadtlander at ¶22)).  "The stress from trying to complete my tasks

7

while trying to recover from that last surgery was duress[]" and "I felt that with IBS stress makes the situation worse. This [the PIP] I considered mega stress."  (Doc. 31-1 (Dep. Mosley at 239-240)).  Per Mosley, "I felt I was being forced to leave."  (Id. (Dep. Mosley at 241)). AM/NS accepted Mosley's resignation.  (Doc. 31-6 at 41; Doc. 31-6 (Aff. Stadtlander at ¶22)).

B.    **Medical Conditions & Disabilities**

In 2016, Mosley reported to Stadtlander that she suffered from IBS-D, via a handwritten note and conversation.  (Doc. 31-1 (Dep. Mosley at 106-107)).  See also Doc. 31-6 (Aff. Stadtlander at ¶19)).  Dolbare was also aware because from time to time, after she became Mosley's manager, Mosley texted her to notify her that she would be late to work due IBS-D symptoms.  (Doc. 31-1 (Dep. Mosley at 107, 204); Doc. 31-3 (Aff. Dolbare at ¶16)).

In July 2017, Mosley began wearing a splint on her hand due to basal thumb osteoarthritis, which caused pain in her thumb and hand and for which she took over the counter medication.  (Doc. 1 at 6; Doc. 31-1 (Dep. Mosley at 190-192)).  Dolbare was aware of this.  (Doc. 31-7 (Dep. Dolbare at 116)).  "I know that she struggled with her hand. I don't know as far as limited use ... she had a splint...that would make it a little more difficult[]" and a big part of her job was using a keyboard with both hands.  (Id. (Dep. Dolbare at 117)).  Mosley also told Dolbare that the problem with her hand made her ability to complete her work difficult: "[s]he expressed that[]" -- "[i]t would just take her additional time. But she never asked us to do anything different for her to perform her tasks."  (Id. (Dep. Dolbare at 117-118)).

In August 2017,[3] Mosley received a steroid injection in her left thumb. (Doc. 31-3 (Dep. Mosley at 191)).  Dolbare was aware that she received injections.  (Doc. 31-7 (Dep. Dolbare at 116)).

---

3 Mosley's reference to this as August 2018 is apparently a typographical error.

On December 7, 2017, Mosley requested leave starting December 29, 2017, for surgery on her left hand due to arthritis (trapeziectomy), resulting in a bone being taken out of the base of her thumb and replaced with a ligament. (Doc. 1; Doc. 5 at 8 (Answer); Doc. 31-1 (Dep. Mosley at 190-191, 193-194); Doc. 31-7 (Dep. Dolbare at 118-119)). Mosley's leave was approved. (Doc. 1 at 6-7; Doc. 31-1 (Dep. Mosley at 194)).

On February 21, 2018, Mosley returned to work with pain, a splint on her left hand, and medically imposed restrictions which required accommodation to work (wearing the splint, no lifting with her left hand, no climbing, no vibratory tools, and no repetitive heavy gripping); she was able to perform her job functions "but it was with a lot of pain still." (Doc. 1 at 7-8; Doc. 31-1 (Dep. Mosley at 190, 193)). Mosley requested, and was granted, work accommodations. (Doc. 31-1 (Dep. Mosley at 201-202); Doc. 31-3 (Aff. Dolbare at ¶16); Doc. 31-7 (Dep. Dolbare at 116-118, 121); Doc. 31-7 at 72). Mosley also requested intermittent FMLA medical leave for follow-up medical treatments and occupational/physical therapy, which was granted. (Doc. 5 at 9-10 (Answer); Doc. 31-1 (Dep. Mosley at 191-193, 202, 250); Doc. 31-3 (Aff. Dolbare at ¶9)). Dolbare states that she also ensured that new tasks were not added to her workload while Mosley was recovering. (Doc. 31-3 (Aff. Dolbare at ¶9)).

However, Mosley alleges that upon her return, Dolbare expressed exasperation at her requests for accommodation and medical appointments by "[j]ust a sigh[,]" and expressed the desire to remove her from her position by commenting "[t]here needs to be an Analyst in your position[]" and she "had better see some improvement" in her job performance, which Mosley "felt ... a threat." (Doc. 1 at 8; Doc. 31-1 (Dep. Mosley at 127-128, 181, 192-200); Doc. 38-2 (Dep. Mosley at 251)). "I felt I was being pushed out of my role because they actually wanted an analyst [with SAP technical expertise] in my position." (Doc. 31-1 (Dep. Mosley at 181-182, 200)). Mosley also felt that Dolbare's work

expectations were unreasonable, as she was recovering from hand surgery, had work restrictions, and her work involves her hands.  (Id. (Dep. Mosley at 200-201)).

In contrast, Dolbare testified that we "discussed the role evolving...there are analysts in other units ... those were some of the opportunities we talked about for her to develop her skill set." (Doc. 31-7 (Dep. Dolbare at 127)).  "[W]e were implementing new systems ... the company evolved ... we had to learn how new systems worked...it was really just about evolving our learning as the company evolved."  (Id. (Dep. Dolbare at 127-128)).  Dolbare communicated to Mosley that she saw the evolution of Mosley's role as continuing as an HRIS Specialist, but being more involved in analytical type work.  (Id. (Dep. Dolbare at 128)).

Additionally, upon her return to work, Mosley discovered that certain data/information had not been processed while she was on leave.  Per Mosley's speculation, Dolbare intentionally left all the new hire data unprocessed -- to accumulate during her absence.  (Doc. 1 at 8-9; Doc. 31-1 (Dep. Mosley at 198); Doc. 38-1 (Decltn. Mosley at ¶55)).

Dolbare explained that such was not the case but that instead, while Mosley was out on leave, she and the team were unable to address the vacation exceptions -- one of Mosley's duties -- because they had to perform their own duties too.  (Doc. 31-1 (Dep. Mosley at 197-199); Doc. 31-3 (Aff. Dolbare at ¶17); Doc. 31-5 (Aff. Mead at ¶12); Doc. 31-7 (Dep. Dolbare at 119-121)).  The team distributed Mosley's workload while she was out and work was not deliberately left for her to have to do upon her return.  (Doc. 31-7 (Dep. Dolbare at 128); Doc. 31-5 (Aff. Mead at ¶12)).  Dolbare testified: "[w]e did not intentionally leave duties" for her when she returned and "when Ms. Mosley returned ... [and] I ensured that no new or additional duties were added to her workload to accommodate the limited restrictions set out by her healthcare provider." (Doc. 31-3 (Aff. Dolbare at ¶17)).

Moreover, Mosley alleges that when she returned to work, Dolbare embarrassed and humiliated her in front of her coworkers by making derogatory comments about her work and subjecting her to constant micro-management -- that Dolbare began going through her work to find deficiencies in her performance and tried to turn other team members against her, and had her co-worker Mead watch her.  (Doc. 1 at 9; Doc. 31-1 (Dep. Mosley at 158, 182-187, 210-211, 259-260)). However, Mosley does not remember any specific derogatory comments, only "the way I felt. I felt inferior."  (Doc. 31-1 (Dep. Mosley at 259)).  Mosley also has no evidence that Dolbare had Mead watch her, but just believed such because of "the numerous comments about errors ... they [Dolbare and Mead] were counting every single error I made."  (Id. (Dep. Mosley at 260)).  "[I]t was more the attitude [of superiority] that I felt from her [Mead] that led me to believe[]" this.  (Doc. 31-1 (Dep. Mosley at 159-160)).

Dolbare testified that she has no knowledge of Mead monitoring Mosley.  (Doc. 31-7 (Dep. Dolbare at 134)).  And according to Mead, Dolbare never asked her to watch Mosley or assess how she performed her job, or even her opinion on same.  (Doc. 31-5 (Aff. Mead ¶10)).  Rather, Mead independently observed, through her interactions with Mosley, that she often made errors that could have been caught by auditing -- e.g., she would frequently enter the wrong type of action in SAP which would negatively impact reports generated from SAP, and she forgot how to perform VLookup in Excel even though she showed her multiple times, etc.  (Id.)

At some point after her return to the office Mosley talked with Team Manager Relations representatives about "the harassment I felt[]" and that "I felt like I was being micromanaged[]" because they were "documenting every error I made when the same ...wasn't ... [happening to] ... others[]" like Mead, Dolbare, and Shay George who made SAP errors (typos) which she corrected but

did not report.  Mosley does not remember the specifics of the conversation.  (Doc. 31-3 (Dep. Mosley at 182-187)).

On April 13, 2018, Mosley experienced pain in her chest, right shoulder, and right arm while at work and was taken by ambulance to Springhill Memorial Hospital, where she remained overnight for cardiac enzyme monitoring.  (Doc. 1 at 11; Doc. 31-1 (Dep. Mosley at 204-205); Doc. 31-5 (Aff. Mead at ¶13)).  Mosley required a cholecystectomy (gall bladder surgery).  Mosley informed AM/NS that she would require surgery on May 22, 2018, and would need additional FMLA leave, which was approved.  (Id.; Doc. 31-1 (Dep. Mosley at 205-206; Doc. 31-3 at 71-72)).  The surgery, however, made her IBS more difficult.  (Doc. 31-1 (Dep. Mosley at 206)).

On May 29, 2018, Mosley returned to work and verbally requested to Dolbare the accommodation of having her workspace moved closer to the bathroom due to gastrointestinal emergencies exacerbated from the loss of her gall bladder.  (Doc. 1 at 12; Doc. 31-1 (Dep. Mosley at 206-207); Doc. 31-6 (Aff. Stadtlander at ¶20); (Doc. 31-4 (Aff. Motes at ¶¶11)); Doc. 31-3 (Aff. Dolbare at ¶18)).  Mosley asserts that Dolbare refused her request. (Doc. 31-1 (Dep. Mosley at 207-208; Doc. 38-1 (Decltn. Mosley at ¶¶59, 61)).  Perceiving her request as having been refused by Dolbare, Mosley went to the TMRs about her workspace request to move her desk.  (Doc. 31-1 (Dep. Mosley at 208)).  Mosley reported Dolbare's denial to TMRs Motes and Doggette, which entailed her explaining the "embarrassing and humbling" reasons for a workspace near the bathroom.  (Doc. 1 at 12-13; Doc. 31-1 (Dep. Mosley 208-210); Doc. 31-3 (Aff. Dolbare at ¶18); Doc. 31-4 (Aff. Motes at ¶11); Doc. 31-6 (Aff. Stadtlander at ¶20)).  Mosley was granted her accommodation by Dolbare the same day she requested it.  Mosley claims that Dolbare observed her report the denial to management and then changed her mind due to same.

12

However, rather than refusal, Dolbare asserts that told Mosley she would consider the request: "I did not refuse her request[]" but her concern with moving her workstation was "she would be away from our team and would miss out on team interaction and discussions....I did not dismiss or rule out her request outright."  (Doc. 31-3 (Aff. Dolbare at ¶18)). Dolbare did not initially think they could accommodate the request because she wanted her sitting with the team, she was trying to make sure she was following the process, and she did not see that accommodation in Mosley's return to work paperwork. [4] (Doc. 31-7 (Dep. Dolbare at 148); Doc. 31-1 (Dep. Mosley at 207-210); Doc. 31-3 (Aff. Dolbare at ¶18); Doc. 31-4 (Aff. Motes at ¶11); Doc. 31-6 (Aff. Stadtlander at ¶20)).  So after receiving Mosley's request, Dolbare spoke with Motes and Stadtlander, a "step that I would normally take if I had a question or concern about how to handle" a team member's request and "[i]n consulting with" them "we agreed that I should accommodate" the request even though they lacked a medical provider's note indicating such was necessary.  (Doc. 31-3 (Aff. Dolbare at ¶18); Doc. 31-7 (Dep. Dolbare at 148-149); Doc. 31-6 (Aff. Stadtlander at ¶20)).  "We did so promptly. No other requests for accommodation were made by Ms. Mosley to me." (Id.)  Dolbare was not corrected or reprimanded by Stadtlander or others for how she handled Mosley's request.  (Id.)  Stadtlander agreed in the decision to allow Mosley to move her workstation.  (Doc. 31-6 (Aff. Stadtlander at ¶20)).

At some point, Mosley met with Robertson again and reiterated her complaints of retaliation and discrimination, which she felt were "dismissed" because "[s]he seemed totally unconcerned about my complaints of retaliation and harassment, bullying[]" "because she didn't address it." (Doc. 31-1 (Dep. Mosley at 219-220)).  Mosley did not ask Robertson to take specific steps because she felt it was Robertson's responsibility to do that.  (Id. (Dep. Mosley at 220)).  Thereafter, Mosley believes that

---

4 No physician made that recommendation to Mosley, she just felt she would be more comfortable at work because of her IBS-D symptoms.  (Doc. 31-1 (Dep. Mosley at 207-208)).

Dolbare intensified scrutiny of her work and was "looking for reasons to criticize and discipline" her. (Doc. 1).   Per Mosley, the "dismissive treatment she received from Team Member Relations [Robertson] evidenced that future complaints would be useless and I had nowhere else to go for help." (Doc. 1 at 19; Doc. 38-1 (Decltn. Mosley at ¶74)).

### III.   <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) provides as follows:

*(c) Procedures*

*(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

*(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

*(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. Rule 56(c).

To succeed, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. Jean–Baptiste v. Gutierrez, 627 F.3d 816, 820 (11th Cir. 2010). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. Id. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); see also Fed. R. Civ. P. 56 Adv. Cmte. Note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials.... [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish -- with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. Celotex, 477 U.S. at 324. A genuine dispute exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. Waddell v. Valley Forge Dental Assoc., 276 F.3d 1275, 1279 (11th Cir. 2001).

IV.   **Conclusions of Law: ADA Interference**

In the Complaint, Mosley alleges that AM/NS interfered with her rights under the ADA in violation of 42 U.S.C. § 503(b). (Doc. 1 at 24-25). Specifically, Mosley contends that AM/NS interfered with her ADA rights when -- with the intent to discriminate against her due to her disability -- it: 1) increased her workload; 2) subjected her to heightened scrutiny; 3) placed her on a PIP (which

15

included false representations about her work performance); and 4) and refused her accommodation request to move her workstation.

> Pursuant to the ADA's anti-interference provision:
>
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b).  Equal Employment Opportunity Comm'n v. STME, LLC, 938 F.3d 1305, 1321 (11th Cir. 2019).  Accordingly, Mosley must show that: 1) she exercised a right protected by the ADA; 2) that AM/NS coerced, intimidated, threatened, and/or interfered with her enjoyment of her ADA rights; and 3) AM/NS actions were motivated because she exercised a right protected by the ADA. See, e.g., Atchison v. Board of Regents of Univ. Sys. of Ga., 802 Fed. Appx. 495, 509 (11th Cir. 2020) (referencing the FHA's anti-interference provision, as discussed in Sofarelli v. Pinellas Cty., 931 F.2d 718, 721-723 (11th Cir. 1991)).

Mosley asserts that she exercised her ADA protected rights to request reasonable accommodations for her disabilities related to surgery on her hand (wearing a splint, no lifting, intermittent leave for therapy for her hand, and light duty) and related to gall bladder surgery which exacerbated her IBS-D (moving her work desk closer to the bathroom).  The record clearly shows that Mosley was granted all requested accommodations except for "light duty," which is vague and undefined.  Mosley now asserts that she should have been given a reduced caseload since her splint interfered with her ability to input data on a keyboard.  There is no evidence that Mosley made any attempt to clarify her request for light duty or make any specific requests related to the performance of her job of inputting data.  However, this is not a failure to accommodate ADA claim, so whether the reduced workload accommodation was requested or reasonable is not at issue.  In the same vein, there

is no evidence that AM/NS required Mosley to perform work that violated her specific work restrictions.

Instead, the issue is whether, as Mosley argues, she was coerced, threatened, intimidated, and/or interfered with by AM/NS because she requested disability accommodations or attempted to enjoy the accommodations provided. Specifically, she alleges that she felt coerced, threatened, intimidated, and/or interfered with because she was assigned a heavy workload (unreasonable expectations), was subjected to heightened scrutiny, and was placed on a PIP (which directed her to improve her performance and misrepresented her performance).

Turning to the elements, first, there is sufficient evidence for a jury to find that Mosley exercised a protected right under the ADA, *i.e.* the requests for reasonable accommodations.[5] As such, the Court's analysis centers on the second and third elements -- whether there is sufficient evidence that AM/NS' actions constitute coercion, threats, intimidation, or/and interference under the ADA anti-interference provision, and if so, whether there is sufficient evidence that AM/NS' actions were motivated by Mosley's request for accommodations (discriminatory animus).

The ADA anti-interference statute is identical to the anti-interference provision in the *Fair Housing Act* ("FHA"), 42 U.S.C. § 3617. "[T]he similarity of language in [the two statutes] is, of course, a strong indication that the two statutes should be interpreted *pari passu*." Northcross v. Bd.

---

5 The Court has previously found that Mosley submitted sufficient evidence that her belief that she had a disability, which entitled her to reasonable accommodation, was objectively reasonable.

of Ed. of Memphis City Sch., 412 U.S. 427, 428 (1973).[6]  Accordingly, the Court will rely on FHA

anti-interference caselaw (to the extent applicable in the employment context).[7]

Concerning the **second element**, the question is whether there is sufficient evidence from

which a jury could find that AM/NS' conduct was coercive, threatening, intimidating, and/or

interfering.  "The statute, regulations, and court decisions have not separately defined the terms

'coerce,' 'intimidate,' 'threaten,' and 'interfere.' Rather, as a group, these terms have been interpreted to

include at least certain types of actions which, whether or not they rise to the level of unlawful

retaliation, are nevertheless actionable as interference." EEOC Enforcement Guidance on Retaliation

and Related Issues, Number 915.004, 2016 WL 4688886, *26 (E.E.O.C. Guidance Aug. 26, 2016).

Additionally, "[w]hile the Eleventh Circuit has not defined the precise contours of conduct violative

of the FHA's interference provision, district courts within the circuit 'agree that Section 3617 extends

only to **discriminatory conduct that is so severe or pervasive that it will have the effect of causing**

**a protected person to abandon the exercise of his or her [ADA] rights.**'" FSI Green Park S. Prop.,

LLC v. City of Pelham, Ala., 2020 WL 4933664, *13 (N.D. Ala. Aug. 24, 2020) (citation omitted)

(emphasis added). Moreover, the conduct need not be a materially adverse employment action.  EEOC

Enforcement Guidance, 2016 WL 4688886, *26-27 ("[b]ecause the 'interference' provision is broader

... it will reach even those instances when conduct does not meet the "materially adverse" standard

required for retaliation[,]" but even so, "[t]he interference provision does not apply to any and all

---

6 See also EEOC Enforcement Guidance on Retaliation and Related Issues, Number 915.004, 2016 WL 4688886, *26 at note 175 (E.E.O.C. Guidance Aug. 26, 2016) ("[t]he ADA interference provision uses the same language as a parallel provision in the Fair Housing Act, and Congress intended it to be interpreted in the same way. H.R. Rep. No. 101-485, pt. 2, at 138 (1990), as reprinted in 1990 U.S.C.C.A.N. 303, 421 ("The Committee intends that the interpretation given by the Department of Housing and Urban Development to a similar provision in the Fair Housing Act … be used as a basis for regulations for this section[]").

7  The Court does not adopt the reasoning of other Circuits which have analyzed ADA anti-interference claims under the same standard as retaliation claims.

conduct or statements that an individual finds intimidating ... it only prohibits conduct that is reasonably likely to interfere with the exercise or enjoyment of ADA rights.").

Mosley claims that she was coerced, threatened, intimidated, or interfered with by an increased workload, heightened scrutiny of her work and placement on a PIP (which included false representations about her performance). There is no evidence of record, except Mosley's conclusory statements, to support a finding that she was given an increased workload, that she underwent heightened scrutiny of her work, and/or that false representations were made about her performance. However, even assuming a sufficient factual basis for her conclusions, none of this conduct -- as described by Mosley -- supports a claim of ADA interference. This is because the described conduct fails to meet the level of severity that would cause a reasonable person to abandon her ADA rights (*i.e.*, such that would be reasonably likely to interfere with the exercise or enjoyment of ADA rights). And the Court notes that Mosley did not abandon her continued requests for accommodation.

This leaves Mosley's placement on a PIP, as the remaining conduct to scrutinize. Mosley's placement on a PIP did not mean that she would definitely be terminated. However, failure to complete the PIP successfully within the time frame provided (90 days) *could* result in a variety of consequences, including termination. As explained by Dolbare: "If the Team Member fails to successfully complete the PIP, then the time[frame] for the PIP may be extended and/or the Team Member's employment may be terminated ..." (Doc. 31-3 (Aff. Dolbare at ¶19); Doc. 38-3 (Dep. Dolbare at 79)). Upon consideration, the Court can discern circumstances under which a reasonable jury *may* find that an employee's placement on a performance improvement plan (PIP), or even the threat of such, could cause a reasonable person to abandon her ADA rights.

However, as to the **third element**, the Court finds there is insufficient evidence that Mosley's placement on a PIP was motivated by her requests for accommodations related to her disabilities

(discriminatory animus by AM/NS caused her placement on a PIP).  Mosley contends that her ADA interference claim is supported by the temporal proximity of her requests and enjoyment of accommodations starting in **December 2017** and her placement on a PIP on **June 22, 2018** (approximately six (6) months later).  **(**Doc. 48 at 17-18 (citing <u>Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees</u>, 507 F.3d 1306, 1316 (11th Cir. 2007) (explaining very close temporal proximity between an adverse employment action and an employer's knowledge of protected activity can evidence a discriminatory motive in the context on the ADA) and <u>Annarumma v. City of High Springs Fla.</u>, 846 Fed. Appx. 776, 782 (11th Cir. 2021) (discussing temporal proximity in relation to an adverse employment action).  The problem with this argument is that the unrefuted evidence shows that the criticism of Mosley's performance leading to the PIP did not start when Mosley started exercising her alleged ADA rights.  In other words, instead, Dolbare noted as early as July 2017 that Mosley had repeatedly failed to audit her work, resulting in numerous mistakes. There is no indication that Mosley engaged in any ADA protected rights prior to December 2017.  So while the criticism of Mosley's work continued during the exercise of her alleged ADA rights, reliance on a temporal proximity argument fails.

Mosley also argues that Dolbare's acknowledgement that she knew Mosley would have difficulty inputting data with a splint on her hand, yet the PIP required increased productivity, constitutes evidence of discriminatory animus because of requested accommodations.  However, Mosley testified that she does not recall ever asking Dolbare to take data entry duties away from her workload due to medical issues.  (Doc. 31-1 (Dep. Mosley at 202)).  And the increased productivity required under the PIP does not appear to relate to the speed at which Mosley entered data.  Rather, the evidence is that the criticism of Mosley's productivity related to her failure to prioritize work and the way in which she performed her work.  Specifically, Dolbare testified that even though Mosley

20

wore a splint, "she was able to do her work[,]" and that while she had problems with Mosley timely completing her work, she believed that was due to Mosley's failure of "[p]rioritization of work task[s]." (Doc. 53-1 at 3 (Dep. Dolbare at 125)).  Additionally, the increased productivity measurability in the PIP appears linked, in part, on Mosley no longer manually entering data but instead using mass data entry procedures.  Indeed, the PIP noted Mosley's historic reluctance to perform mass data entries – that she preferred to manually enter data.  The repeated instructions in the PIP are for Mosley to learn to perform the mass entries to reduce the number of manual entries.

This leaves the Court with a record indicating that the PIP was issued due to Mosley's poor work performance and not because she exercised her alleged ADA rights to seek reasonable accommodations.  In sum, the record reveals insufficient evidence that AM/NS interfered with Mosley's exercise or enjoyment of her ADA rights.

## IV.    <u>Conclusion</u>

Accordingly, it is **ORDERED** that Summary Judgment is **GRANTED** in favor of the Defendant as to Plaintiff's ADA interference claim.  Accordingly, the trial scheduled for April 5-7, 2022 is **CANCELLED.**

Final Judgment shall issue in accordance with this Order and the prior order (Doc. 46).

**DONE** and **ORDERED** this the **21st** day of **March 2022.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**